The appellant was tried and convicted of murder in the first degree and his punishment fixed at death.
The evidence offered by the state to prove the corpus delicti goes to show that on the night of May 24, 1930, at about 10 o'clock p. m., an attempt was made to rob the deceased, by a man dressed in striped overalls and a black shirt, masked with a red handkerchief over his face; that the overalls were of the same kind in general as those worn by Tom O'Neal, one of the state's witnesses, and Hatchett, both employees of the Blue Ribbon Oil Company; that W. T. Smith, the deceased, was in the act of closing his place of business, a gasoline filling station operated by the Blue Ribbon Oil Company at 4306 First Avenue North, in the city of Birmingham, under the management of Smith; that just as Smith had closed and locked the door the man approached Smith with drawn pistol and ordered him to hold up his hands; that Smith seemed to recognize the man and called his name "Charlie," grappled with him, and in the scuffle over the pistol was shot, one shot taking effect in one of his legs, and another through the body. *Page 74 
Whether or not the robber succeeded in obtaining Smith's wallet or money bag, which he carried in his hip pocket, does not appear; but this is not deemed of any importance. After the shooting the robber left through the back way, and Smith died shortly thereafter.
The evidence offered by the state to connect the defendant with the commission of the offense consists of circumstances showing his presence in the immediate locality of the crime and alleged confessions made by him to Tom O'Neal, a negro employee of the oil company at the filling station, and to the arresting police officers in the presence of others.
Tom O'Neal testified in behalf of the state, his testimony going to show that he was present at the time of the killing in a Ford automobile, with another negro by the name of Hatchett, waiting to carry Smith to his home; that defendant first approached witness and Hatchett and commanded them to hold up their hands, but remarked: "You-all ain't got nothing. You-all stay here and wait," and then went immediately to where Smith was closing the door and commanded him to hold up his hands; that Smith resisted and engaged in a scuffle with defendant and was shot; that neither witness nor Hatchett said or did anything, until Smith was shot; that witness then called the police and the ambulance, and notified Mr. Norton, the manager of the oil company.
This witness further testified: "I knew Charlie Jackson before this. I did not have any conversation with him about robbing Mr. Smith, before this, and I did not know that he was going to rob Mr. Smith. I had a conversation with him after he robbed Mr. Smith, on Tuesday, this was on Saturday night. He told me something about it on Tuesday. Before he told me about it, I did not threaten him or offer him any inducement, or any reward to tell me about it. Nobody else in my hearing or presence threatened him or treated him with violence. I did not do any of these things. Charley and I were good friends then. We were at his home when he told me about it. I visited him up there at times. He told me that he killed Mr. Smith, and that he believed that I knew it, and he told me because he didn't want me to tell it. I did not promise him that I would not tell it. I told him that I would tell it if I had to tell it, but I would try to keep from telling it as long as I could. I told it when they arrested me, which was on Saturday, August 29th — August or September, one. I told the officers about it when I was arrested. I did not have any part in robbing Mr. Smith, and I didn't know anything about it before he was robbed."
This witness testified on cross-examination: "I did not know it was Charlie. I did not know it was Charlie then. I did not know it was Charley until he told me two or three days later, and that was the first time that I knew it was Charley. I had been sort-of-buddying around with Charlie. I would be with him at times. Hatchett, Charlie and Mack Madkins and I did not buddy around together, just me and Charlie. He came to my house sometimes, and I went to his, and we talked together. But I did not know his voice. He came up there and said: 'Stick them up,' and then walked up and told Mr. Smith to stick them up, and I heard him say that, and I did not know it was Charlie, until some days later."
This witness further testified that the defendant, about ten minutes after the shooting, was in the crowd that gathered at the filling station, dressed in blue pants and a white shirt.
This witness further testified that after he, Mack Madkins, and Frank Odum were arrested, "I told the officers down there that I didn't have anything to do with it, and I told them at first that I didn't know who had anything to do with it. They did not tell me that they were going to prosecute me for the murder. They told me they would hold me for the murder, and they told me if I didn't tell what I knew about it that it was going to go hard with me, and they whipped me with a rubber hose. I don't know who did the whipping, but it was the man that arrested me. They whipped me with a red rubber hose. They said they didn't do nothing but slap Mack Madkins. I did not see the cut places and bruised places on his back, but I had cut and bruised places on me, after they put me through this rubber hose business. I told them that Charley was the one. I don't know whether I got out of it myself or not, but I don't reckon I am charged with the murder now. They told me I was held for a material witness. I was transferred and made bond at the County Jail as a witness. I don't know whether they whipped Charley or not."
Willie Frank Odum was also offered by the state as a witness, and in response to the examination by the solicitor, testified that he did not have a conversation with the defendant after the killing; that he had seen defendant in conversation, but did not know what he was talking about; and that he did not hear him make any statement about Mr. Smith being killed. During this examination the witness seems to have manifested that he was testifying under pressure of fear, and the court, over defendant's objection, allowed the solicitor to ask the witness: "Just to refresh your recollection, now, Willie Frank, didn't you tell me yesterday that you heard Charley Jackson here talking in the presence of his father?" And the witness responded: "In jail." The solicitor then asked: "In jail? Well, what did you hear him say?" And the *Page 75 
witness, after defendant's objection was overruled, was instructed by the court: "Go ahead and answer the question, boy. Don't be scared to answer the question." The witness then answered: "I am not afraid. They were talking in the lavatory. I was standing on the outside, and I walked in, and they were still talking, and he asked me, he said, 'Willie' — at first he told me — I am talking about Charlie Jackson. 'He told me that he had told his father that he pleaded guilty, and that Tom told him that he was going to plead guilty, but Tom refused to do so,' and I walked out of the lavatory. That is all I heard about that."
The defendant's motion to exclude this testimony was overruled, and the witness testified in response to questions put by the court, as follows:
"Old man, before he made that statement, did you or anyone there in your presence or hearing there make any offers or promises or inducements to Charley Jackson? A. No, Sir.
"Was he threatened, or intimidated, or abused by you or anyone else in your presence or hearing? No, sir.
"Anything done to him at all there at the time? No, sir.
"Was he told that it would be better for him to say that, or worse for him to say that? I hadn't heard that.
"I am just asking you if any such thing as that was done there by you or anybody else? No, sir."
On further examination the testimony of this witness tended to show that his fear was of the defendant.
Officer Murphree, who worked on the case against the defendant and others, growing out of the killing of Smith, testified that defendant made more than one statement to him; that in his first statement, made within an hour and a half or two hours after his arrest, defendant said "that he was the lookout man, at Mr. Smith's filling station. He said he was on First Avenue sidewalk, and he said him and Tom O'Neal had talked it over, and had framed to hold up Mr. Smith, and that he acted as the look-out man, and also Willie Frank Odum. He told Willie Frank Odum to get the gun, and he claimed that he went off and he came back and he couldn't get the gun, and later Tom went and got the gun, brought his daddy's gun, Tom O'Neal; and he told Tom to be the gun man, and Tom told him he wasn't going to be the gun man. He did not tell me that he shot Mr. Smith when he made the first statement. He made the second statement to me in the City Jail at Ensley on the following Sunday morning, after he was arrested on Saturday afternoon. * * * He said he wanted to tell me the truth about it. He said that if I would go and tell Tom O'Neal and make Tom tell me the truth and then come back and tell him what Tom said, then he would tell me the truth. I says, 'I have already talked to Tom, and I am not going to tell Tom a lie to get you to tell me the truth,' and he said, 'Well, I think you are a square man, and I am going to tell you the truth,' and I said, 'Well, tell me how it happened, Charley,' and he said, 'All right, sir,' and he asked me to stand up. I was sitting on a cot in jail. And I stood up with my face to the wall, and he says, 'Mr. Smith was locking the door, and I walked up behind him and put the gun in his right side of his back and I told him to stick them up, and Mr. Smith turned around, and in turning around Mr. Smith recognized me and he grabbed me and we were in a little scuffle, and I went to pull back and the gun went off. I didn't mean to pull the trigger, but it went off, and I think it hit him in the leg, and the scuffle kept on,' and he says, 'Then the second shot was fired and Mr. Smith kind-of caught himself and I got loose from him and I started off a little piece, and I threw the gun down in some weeds and went back and got the gun and carried it to my house and put it under the house on a sill, and I went back to the filling station before the ambulance got there, and I saw them put Mr. Smith in the ambulance,' and I said, 'Charley, will you be willing to tell my partner, Mr. Brown, and Chief McDuff and the Solicitor that?' And he said, 'Will tell anybody that. I am telling the truth about it, Mr. Murphree,' and I said, 'all right.' As quick as I could go and get my partner and the Chief and carry them to Ensley, why, he made the same statement to Mr. Brown and Chief McDuff, and then later made it in Tom O'Neal's presence. On the next day, the following Monday, he made it to Mr. McAdory in the Solicitor's office."
The predicate for this evidence was (to state it in the language of the witness): "Before he made the first statement, neither I nor anyone else in my hearing or presence told him it would be better for him to make a statement, or worse for him if he did not. Neither I nor anyone else offered him any inducement, or offered him any reward or held out to him any hope of reward in my hearing and presence, to do any of those things. I did not, nor did anyone in my hearing or presence threaten him with violence, nor any of those things. * * * Before he made the [second] statement, neither I nor anyone in my hearing or presence said that it would be better for him to make the statement, or worse for him if he did not. We did not offer him any inducement to make a statement, or any reward, or hold out to him any hope of reward, or threaten him, or treat him with violence. * * * Some in my presence encouraged Tom O'Neal to talk a little. They used a strap on him a littlein my presence. They did not use a strap any on Odum, or Charley. Not an ill word was spoken to *Page 76 
Charley, and nobody told him it would be better for him or worse for him if he would tell it, in my hearing. And nobody in my hearing or presence told him that what he said there didn't amount to anything, that he could explain himself when he got in Court, before he made any statement." (Italics supplied.)
Mack Madkins, who was confined in the county jail in connection with the killing of Smith, testified that defendant told him, on the morning before Smith was killed, "that he and somebody else were going to get some money from him, but he didn't call the other party's name. He told me that he was going to get $140.00 from him that Saturday night"; that he "did not hear the shots when Mr. Smith was killed," but went up there before Smith was removed; that there was a crowd there; that he thought of what defendant had told him and he went to defendant's house and asked for him and he was not there; that he returned to the place of the killing, and defendant was in the crowd dressed in blue pants and a white shirt; that defendant worked for the Standard Oil Company station about a block from the place of the killing; and that defendant lived within about one block of the place of the killing.
And on cross-examination: That witness worked at night at the same filling station where defendant worked during the day; that "he [defendant] left there between 6:30 and 7 o'clock. That was his regular getting-off time. I worked at night after he got off. Charley wore overalls down there at the filling station, but I didn't see him with any striped overalls with suspenders on at all down there. All of those Standard overalls were coveralls. I heard part of Tom O'Neal telling about this killing down in jail there. I can't use the exact words he used, down in jail. Charley asked Tom what he told that lie on him for, and Tom said 'that he had to tell something, that they were about to kill him.' They whipped me down there, but they didn't make me tell what I am telling now. I don't know whether they whipped Charley or threatened him. Tom said they whipped him, but I don't know. I didn't hear those officers say anything about whether they whipped Charley or not, or threatened him. Charley was complaining about being whipped down there."
The defendant on the trial denied that he shot Smith, or was in any way connected with it, and denied that he made the statement testified to by Madkins; and testified that he was at his home at the time, and offered some evidence tending to corroborate his testimony as to his whereabouts at the time of the killing, and to show his good character. He admitted on the witness stand, however, that he made the statements testified to by Officer Murphree, but testified: "They whipped me and threatened me there at the City Hall, that Saturday night. There were about fifteen of them had me in the room in the City Hall. The dropped me down across the chair down there, but I don't know that Mr. Murphree was there then, and they whipped me there good that Saturday night, and they went and got my wife and whole family and had them up there, and so that Sunday morning they came and got me and carried me out to the Ensley jail and Mr. Murphree and them came out there and told me that if I would do that, that he would help me, and Mr. Murphree said if I would tell him that I did it he would help me, he said, 'You have got good enough rating almost to clear yourself now.' They used a hose and strap and threatened me, and dared me to tell it. I had a conversation with Tom O'Neal at the jail. Tom showed me scars on him. They were fresh then. He showed me the scars, and he said, 'I don't have to tell you a lie. You can see them. I had to tell them something.' The officers told me that I could explain it in court as to how it happened. After I got to the City Hall in Ensley — I don't remember what date it was, but I was out there and they came out there every day trying to get me to tell it, that I would have a chance to explain myself up here in court. Well, they were having court out there that morning and some man came from up there in the front and he asked me what did they have me charged with and I said, 'For killing this man out in Avondale,' and he said, 'Man, you are in a bad fix, they are liable to kill you.' I don't know whether he was an officer or not. He came out of the office. At the Police Headquarters down there at the time I am speaking of, a man told me that if I did tell it, I would have a chance to explain it in court as to whether I did it or not. They said, I wouldn't see no court if I didn't tell it."
After the defendant had concluded his testimony and closed his case, the state called to the stand Mr. King, the court reporter, who was allowed to testify, over the defendant's objection, that he reported in shorthand and transcribed a confession made by the defendant in the presence of the assistant solicitor and Officer Murphree, and transcribed the same on a typewriter; that the confession was correctly taken and transcribed, and after reading the same, was allowed to state from recollection parts of said confession. After objection and motion to exclude was overruled, in response to questions put by the court, the witness testified that at the time the alleged confession was made, neither the witness nor any one else in his presence or hearing, to his knowledge, made any threats, promises, inducements, or held out any hope, reward, or inflicted any violence, or in any wise threatened or intimidated the defendant.
The court ex mero motu instructed the jury as follows: *Page 77 
"Gentlemen, in this case, which is the State of Alabama against Charley Jackson, the defendant is charged with murder, it being charged by the indictment in this case that, for [before] the finding of this indictment, Charley Jackson unlawfully and with malice aforethought, killed W. T. Smith by shooting him with a pistol, against the peace and dignity of the State of Alabama.
"The indictment, gentlemen, on its face, charges murder in the first degree. It also includes the lesser degree of unlawful homicide, of murder in the second degree, manslaughter in the first degree, and manslaughter in the second degree. [Exception 1.] However, gentlemen, according to the theories ofthe parties in this case, that is to say, the theories of theState and theories of the defendant, and both agree to so stateto you that, if the defendant is the person who killed W. T.Smith, that he is guilty of murder in the first degree; and ifhe is not, he is not guilty of any degree of unlawful homicide,the Court submits to you only the question of whether or notthe defendant is or is not guilty of murder in the firstdegree. (Italics supplied.)
"The defendant has also requested that the lesser degree of unlawful homicide be charged out, that is to say, be withdrawn, and the Court accordingly does give you the charges and will read them to you later, leaving only for your consideration the question of whether or not the defendant is or is not guilty of murder in the first degree.
"Murder in the first degree, gentlemen, may arise in one of two ways. Any killing of a human being willfully, maliciously, and with premeditation and deliberation is murder in the first degree. Willfully means that the act is intentional, that it is governed by the will, and that the person committing the act does not yield to reason or to judgment; a malicious killing means one that is done with spite or ill-will, or from any improper motive or purpose; a premeditated killing means one that is done with premeditation, as distinguished from a sudden or rash act; and deliberate killing means one that flows from a design beforehand.
"Now, another thing, gentlemen, that constitutes murder in the first degree, and that is a law upon which the State proceeds in this case, is this: That every homicide committed in the perpetration of or the attempt to perpetrate any arson, rape, robbery, or burglary, is murder in the first degree. If a person should be attempting to perpetrate a robbery, or commit a robbery, and should either intentionally or unintentionally kill the victim of the robbery, or of the attempted victim of the robbery, then that would be murder in the first degree.
"Now, the State contends in this case, gentlemen, that on May 24, 1930, the defendant did attempt to rob, or did actually rob, W. T. Smith, and in the encounter which then and there immediately resulted that a pistol was discharged in the defendant's hand, which took the life of W. T. Smith.
"The defendant, on the other hand, gentlemen, says that he was at a different place, and that he was not the person who committed, or attempted to commit the robbery on W. T. Smith, and that, on the other hand, that the defendant was at some distance removed, and that he had no connection with the robbery. He sets up, gentlemen, what is called an 'alibi.' And alibi means that he was at a place such a distance away that he was not connected with the commission of the alleged attempt, and says that such evidence tending to show an alibi should engender a reasonable doubt of his guilt in your minds along with the other evidence in the case.
"The law says, gentlemen, that you should take that evidence and give it such consideration as you think fit and proper, and carefully consider it, and if it does generate a reasonable doubt of his guilt, you should acquit [Exception 2]; that if,on the other hand, you find that the evidence of an alibi isfraudulent and false and simulated, that you may take that inconsideration also in determining the guilt or innocence of thedefendant. It is for you to say which of the contentions is true, whether that that the State argues to be true is true, or whether that which the defendant argues to be true is true. It is not the province of the Court to advise you what its opinion might be as to the guilt or innocence of the defendant. The Court, in that connection being prohibited by the law from attempting to advise you or make any suggestions or information to you as to what its opinion might be, and no ruling by the Court, or any instructions by the Court, or nothing said by the Court which you have heard addressed to you before the reading of the written charges should be taken by you as any indication that the Court holds any opinion as to the guilt or innocence of the defendant. That is a duty and burden, gentlemen, that the law places on your shoulders. (Italics supplied.)
"Now, under the law, gentlemen, the burden of proof rests upon the State to satisfy your minds beyond a reasonable doubt of the guilt of the defendant; and he is presumed to be innocent until his guilt is proven beyond a reasonable doubt that he is guilty, you should convict him; if you are not satisfied beyond a reasonable doubt that he is guilty, you should acquit him. Necessarily, gentlemen, in determining what the truth is, you must resort to the testimony of the witnesses. That is the only proper source of information to you as to the matters and things charged against the defendant in the case. It is further necessary, of course, that you *Page 78 
should place an estimate on the testimony so adduced before you, that you should take the testimony and weigh it.
"Now, the law says that in weighing the testimony, in seeing what strength and what weight and what value it is, that you may consider the appearance of the witnesses upon the witness stand, whether they have impressed you favorably or unfavorably, whether they have attempted to testify disinterestedly and fairly, or whether, on the other hand, with evasion and with indirection. You may consider any circumstances that would naturally have a tendency to cause the witness either to adhere to the truth or to depart from the truth.
"[Exception 3.] Now, the law says that when you go in thejury box you are not expected to abandon all that you had ofreason and common sense and sound judgment before you came intothe jury box. The law expects you to bring them right into thejury box with you. Your experience, your reason, your judgment,your knowledge of men and things, and of how things happen andhow people behave, all to aid you and guide you in saying justwhat the truth is with reference to the issues of fact that aresubmitted to you for your consideration. (Italics supplies.)
"Now, gentlemen, if you find the defendant guilty, the amount of punishment will be fixed by you. If you find him guilty of murder in the first degree, the punishment either is death or imprisonment in the penitentiary for life. So, if you find the defendant guilty of murder in the first degree, the form of your verdict would be, 'We, the jury, find the defendant guilty of murder in the first degree as charged in the indictment, and fix his punishment at death.' If you fix the punishment at death — if you fix it at life imprisonment, then the form of your verdict would be, 'We, the jury, find the defendant guilty of murder in the first degree, as charged in the indictment, and fix his punishment at life imprisonment in the penitentiary.'
"If you find the defendant not guilty, the form of your verdict would be, 'We, the jury, find the defendant not guilty.'
"Here are certain instructions, gentlemen, which have been requested in writing by the defendant. They are correct statements of the law, and should be taken by you in connection with the Court's Oral Charge.
"(The Court read the written requests to charge.)
"The Court: Those are the three lesser degrees of unlawful homicide, which, as stated, are not submitted to you in the case.
"There is one thing further, gentlemen, that the Court intended to instruct you upon, and that is with reference to the subject of reasonable doubt. The Court would say to you further, as heretofore, in reading the charges, or giving the charges to you, it is not the purpose of the Court or the purpose of the law to emphasize to you that the defendant might be guilty of one thing or guilty of the other. These are correct statements of law that are given you, and should be considered by you in your consideration of the case. With reference to the subject of reasonable doubt, gentlemen, it is the law that reasonable doubt means an actual, substantial, real doubt, and one that some reason exists for from every matter appearing in evidence in the case, or from the absence of sufficiently satisfying evidence to satisfy your minds beyond a reasonable doubt. [Exception 4.] A reasonable doubt isnot a mere possible doubt, a speculative or conjectural orfanciful doubt. If you have only that sort of a doubt of thedefendant's guilt, then you should convict him. If, on the other hand, you do have a real, actual, substantial doubt of his guilt, that would be a reasonable doubt, and it would be your duty to acquit him in the case. (Italics supplied.)
"[Exception 5.] Now, for your convenience, gentlemen, theCourt has drawn two forms of verdict to be used by you, oneform is to be used in the event that you find the defendantguilty of murder in the first degree. You may take this formalong with you and use it if you find the defendant guilty ofthat offense. The other form, gentlemen, is a form to be usedby you in the event you find the defendant not guilty. You maytake these two forms along with you, gentlemen, and use the onethat is appropriate to the verdict that you decide to return." (Italics supplied.)
The defendant requested the affirmative charge in his favor, as to murder in the first degree, murder in the second degree, and manslaughter. The court refused the charge as to murder in the first degree, and gave the charges as to the other degrees of homicide, leaving nothing to be considered by the jury except defendant's guilt or innocence as to murder in the first degree.