51 So.2d 233

**EDWARDSON v. STATE.**

**1 Div. 415.**

Supreme Court of Alabama.

March 1, 1951.

Douglas Stanard and Robt. T. Cunningham, of Mobile, for appellant.

Si Garrett, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

BROWN, Justice.

This is the appeal of Lexie Lugenia Edwardson who was indicted by a Grand Jury in the Circuit Court of Mobile County for murder in the first degree, the indictment charging that "before the finding of this indictment Lexie Lugenia Edwardson, whose name is to the Grand Jury otherwise unknown than as stated, unlawfully and with malice aforethought, killed Chester Tullous by shooting him with a gun, against the peace and dignity of the State of Alabama." On her trial she was convicted of murder in the first degree and sentenced to suffer death by electrocution. The appeal comes here under the Automatic Appeal Statute. Code of 1940, Tit. 15, § 382(1), Pocket Part.

The defendant before arraignment made motion to quash the indictment on the following grounds, among others: "(7) The defendant was compelled to be a witness against herself before the Grand Jury returning this indictment."

The state did not take issue upon this motion but demurred thereto on sundry grounds, among others, that said indictment is legal and proper in all respect; that the said grounds assigned are not grounds upon which this indictment may be quashed; that this indictment cannot be tested by motion to quash on the ground there was no sufficient evidence before the Grand Jury which returned said indictment; because this indictment cannot be tested by motion to quash on the ground there was no legal evidence produced before the Grand Jury which returned this indictment; because this indictment cannot be tested by a motion to quash on the ground there was no legal evidence to authorize the finding of this indictment; because this indictment cannot be tested by a motion to quash on the ground that the evidence upon which the indictment was based was incompetent and because this indictment cannot be tested by a motion to quash on the ground there was no legal evidence to support the indictment.

The court sustained the demurrer to the motion to quash and the defendant excepted. The effect of the demurrer was

to confess as true the facts stated in the motion to quash and the court erred in sustaining the demurrer thereto. The state should not have demurred and if the facts alleged were not true, issue should have been joined and evidence adduced to prove the facts. Hart v. State, 117 Ala. 183, 23 So. 43; Allen v. State, 162 Ala. 74, 50 So. 279; Sparronberger v. State, 53 Ala. 481, 25 Am.Rep. 643. The motion to quash was the proper way to raise the question. Franklin v. State, 233 Ala. 203, 171 So. 245; Thompson v. State, 24 Ala.App. 300, 134 So. 679.

Aside from the alleged "voluntary" confessions procured from the defendant, the evidence against her is entirely circumstantial and tends to show that on the morning of December 27, 1949, the body of the deceased, the fourteen year old son of the defendant, was found in the back room of the house where he usually slept. The house on Monroe Street in the City of Mobile was the home occupied by the defendant and the deceased. It appeared that his death had resulted from a gun shot wound entering the breast. The wound, as testified by Dr. Grubbs, the Toxicologist, was "two and a half inches from the midline of the body at the nipple level, ranging down into the body through the lower lung, the upper end of the stomach into the backbone. This wound was five-eights of an inch in diameter and had about it a powder stain which was two and a half inches in diameter. This stain was determined to be a powder stain by chemical analysis of some of the material from the skin. The wound was in the upper edge of this powder stain, entered the body and ranged downward at an angle of thirty degrees, from the vertical and forty-five degrees from the horizontal and struck the backbone. A portion of the shot remained under the skin at the backbone and three shot went through the tissues to the outer side. This wound was through the major vessels of the liver and the lungs and sufficient to cause death."

The evidence tends to show that the shot was fired from a shot gun loaded with no. 6 shot, three of which passed through his body and were on the inside of his under-wear or clothes but the major part of the charge appeared under the skin next to his spine constituting what the toxicologist characterized as a "pone of shot."

The evidence shows that the defendant spent the night of the 26th of December with a friend, a Mrs. Hare, who lives a few blocks away from the defendant's residence and defendant had stated to Mrs. Hare when she went to her house that she was afraid to stay in the house with the deceased, who had threatened to kill her and himself, and shortly before she left the house she discovered the gas in the bathroom had been turned on in full force, that she had heard deceased going in and out of the bathroom several times.

The evidence goes to show that when the defendant returned to her home next morning about nine o'clock the house was closed and locked from the inside and defendant procured the help of the landlady's son Billie Peavy to aid her in getting into the house. He opened a screen of a side window on the back so he could climb through and open the house from the inside. After the doors were opened by Billie, defendant went to the living room in the front of the house, took off her wraps and then went back to the back bedroom where the deceased was found. She then began to scream and she and the boy went on out the front door and back to the home of Mrs. Peavy who lived next door and Mrs. Peavy called the police who soon arrived and began the investigation. The body was lying diagonally across the cot, backside down with feet on the floor. Blood had run down on the cot and on to the floor and on the deceased's clothes. The muzzle of the gun was resting on the cot beside deceased's body with the butt on the floor and the "forearm" was off and on the floor. The police officers took the defendant into custody, carried her to the police station where she made a statement. (This statement was not adduced in evidence.) They released her to arrange for the funeral of the deceased and to attend his burial. The police however kept her under strict surveillance until after the funeral on the 29th of December, when they arrested her and committed her to

jail after "docketing" a case against her. Some six days later, after the defendant had been questioned day and night by a number of detectives persistently, they procured from her a full confession, which not only related the circumstances attending the death of the deceased, but gave in detail the history of defendant's life. The confession was procured on the afternoon of January 3rd after a narcotic had been administered to her by the City Physician, Dr. "Hope." The alleged confession was taken by the Administrative Assistant to the Solicitor, William Kerns. Among other things, he testified as follows:

"On the 3rd of January I went over to the Police Department to check the docket for the next morning and I had to see Captain Rollings and there were several cases set. and I had to get reports on it, and about three-thirty when I got him out and talked to him he told me to stick around for a few minutes that he wanted me to do something for him, so I went ahead and picked up my reports and checked into them, and about quarter to five Captain Rollings came out and asked me to step in his office, which I did. He and Detective Burch and Mrs. Edwardson were sitting at the desk. He introduced me to Mrs. Edwardson and told her who I was, that I was connected with the Solicitor's Office, and told her that he was preparing to turn his investigation report over to us on the investigation he had made on her, and *asked her if she would like to tell anything for her side of it,* said I would be glad to take it down, and she said she would, so we started off talking to her and I just sat there and listened and did all the writing and then come on over here and typed it out and brought it back over there and gave it to Captain Rollings.
* * *

"Q. And did they threaten her in anyway to get her to say anything, hold out any inducement to her or offer her any reward to get her to state what she did state and you took down and typed and which she signed? A. No sir.
* * * * * *

"What were they doing in there?

"A. Mrs. Edwardson was sitting at Chief McFayden's desk, it was in his office, and Captain Rollings was facing her on the other side and I heard him reading it and then I saw the lady check it.
* * * * * *

"Q. What time was that? A. That was about three-thirty or quarter of four when I was talking to him."

Police Captain Rollings, testified that he sent the defendant "back there to be given some medicine but he didn't know what it was." Dr. Hope, the City Physician, testified:

"Q. And you treated her on one occasion you testified, what was the trouble with her? A. Well, my recollection is that she was complaining, said she hadn't been able to sleep all night, and I think she said that they sent her to the City Hospital, but that they didn't do anything for her, and she was suffering with cramps, and said she did that every month and she needed something to relieve her so she could sleep a little, she was just all upset, she was in trouble.

"Q. And did you prescribe for her? A. Yes, I think I gave her a quarter of a grain of codeine; I think that is what it was, but I am not sure about that, just gave her a sedative.
* * * * * *

"Q. And you gave her two of those, is that correct? A. Yes sir; and

"Q. And did you have any conversation with her? A. Yes, she talked and told me, said something about her troubles, she just couldn't stand it any longer, she was suffering and couldn't sleep.

"Q. How long did you stay with her? A. I wouldn't, four or five minutes, I reckon, something like that.

"Q. And she got to talking after she got— A. She was talking then and discussing her case and she had trouble every month with these cramps.

"Q. And after you got through with her did you see Captain Rollings. A. No then she, she was talking and started to tell me and talking about her trouble *and I said talk to the officers about that, and*

*so I went down: and told them to tell Captain Rollings to go up there and talk with the lady.* · ····

·"Q. Yes sir; you gave her the codeine and went down·and told Captain Rollings to go up and talk with her? A. I told her, I don't remember, I·don't believe Rollings was there, I told somebody, I don't recall now who· it was.

\*  .  \*  .  \*  \*  \*  \*

·"Q. Did you tell anyone you had given her those tablets? A. Yes, I think I, whoever I told there, that she was nervous and all and I had given her something to relieve the pain, and she was talkative and they might go up there and talk with her.

..."Q. The man you told was Chief Dudley McFayden, wasn't it? A. I don't remember who it was; I think I called, I am not sure, but I called Captain Rollings when I, after I left there—

"Q. Yes sir? A. And called him to the phone, I ·think, now that is my recollection, and told him he might go by there and talk with her.

"Q. Yes, sir; and do you know whether they went by there and talked with her then? A. No, I didn't know until after that, I believe I asked that afternoon; he had sent some of the men there to talk to her. \* \* \*." [Italics supplied.]

During defendant's incarceration she was repeatedly and strenuously questioned by detectives Barclay, Powers, Burch, Captain Rollings and Ralph Jordan. She was carried into the office of the Chief of Police during the questioning and then into the court room where the policemen gathered to answer roll call and Burch questioned her in the court room and while they were in there the entire police force appeared for roll call and he explained to her what their functions were and how the police operated.

Before the alleged confession was·made Burch carried her out to a cafe, purchased a meal for her and himself and they sat down and ate at the same table on terms of apparent confidence and social equality. During the time intervening between her incarceration and confession they carried her to the hospital, to the house where the body was found, pointed· out to her the gun, made her handle the gun and pull. the ·trigger, showed her a ·picture of the boy, showing the wound with the blood stains, telling her she was guilty and she. might as well confess and get it off of her chest,. that they had a strong case against her. On another occasion one of the detectives sent out and got for her a coca cola and sandwich, which they gave her. But not until she was treated by Dr. Hope on the 3rd day of January, the sixth day after her arrest, did she make the alleged confession.

During the course of her interrogation and before such alleged confession was made, she was confronted by one Simpkins, an old man who was in jail for drunkenness, who accused her of offering him $200.00 to kill this boy, which she emphatically denied and denied ever knowing or seeing Simpkins.

▆▆ In the case of Kelly v. State, 72 Ala.· 244, 245–246, decided by this court constituted of Brickell, Chief Justice, Stone and Somerville, JJ., the court observed:

"The confession made by the prisoner to the witnesses Cornutt and Lawler, should, in our opinion, have been excluded as evidence. True, it is stated by these witnesses, that they made no threats, or promises, by which to educe such confessions. This, however, is but the statement of a mere opinion, and not of a fact, as the evidence imports otherwise. The witness Lawler testifies as follows: 'I said to him: (defendant), *"You have got your foot in it, and somebody else was with you. Now, if you did break open the door, the best thing you can do is to tell all about it, and to tell who was with you, and to tell the truth, the whole truth, and nothing but the truth."* I wanted to produce the im--. pression on his mind, that it *was best for him to tell us about it* [and] I *did produce that impression* before he would tell me.' This was said in presence of the witness Cornutt, who, as constable, held the defendant under arrest at the time.

"It is no doubt the sounder doctrine, that a mere adjuration to *speak the truth,*

addressed to a prisoner, will not authorize a confession induced by it to be excluded, where no threats or promises are applied.— Whart.Cr.Ev. §§ 647, 652, 654; Aaron v. State, 37 Ala. 106. Nor can a promise, or inducement, be implied from the exhortation that it is *best* or *better to tell the truth,* it having been frequently so adjudged.—King v. State, 40 Ala. 314; Aaron's case, 37 Ala. 106; Whart.Cr.Ev. § 647; 2 Lead.Cr.Cases, 189. But the rule is otherwise, where the party has been told, by a person in authority, that it is better for him to confess, or that he will be bettered by saying a particular thing.— I Phil.Ev. 4th Amer.Ed. 542–3; Whart. Cr.Ev. §§ 651, 654; 1 Whart.Amer.L. § 686.

"The exhortation to the prisoner did not stop with adjuring him to tell the truth, or only with telling him that the best thing he could do was to tell all about it, in the event he was guilty of the breaking. It goes further, by assuming his guilt, and by assuming also that the prisoner was accompanied by one or more accomplices; and he is told, in effect, that it would be best for him to tell all about these assumed facts. The manifest impression produced on the prisoner's mind must have been, that he would, in some unknown manner, fare better by confessing his guilt of the crime of burglary; and this inducement vitiates any confession evoked under its influence. Whart.Ev. § 651; State v. York, 37 N.H. 175; Vaughan v. Com., 17 Grat. 576; Clark's Man.Cr.L. § 2948.

"If we are to understand from the bill of exceptions, that the confessions testified to by the witness Lawler, in detail of the alleged burglary, followed the above inducement, or were elicited by it, as we think is its correct construction, these confessions were improperly admitted to go before the jury."

In Jackson v. State, 226 Ala. 72, 145 So. 656, 662, it was observed:

"While the law abhors murder, and provides every legitimate means humanly possible to bring the manslayer to justice, it does not tolerate questionable practices by persons in authority of procuring evidence, and excludes as evidence *extrajudicial* confessions of guilt made under the pressure of fear or hope in respect to the alleged crime. The true grounds upon which the rule rests 'is, not because any wrong is done to the accused, in using them, but because he may be induced, by the pressure of hope or fear, to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief, or avoid the threatened danger, and therefore admissions so obtained have no just and legitimate tendency to prove the facts admitted.' Commonwealth v. Morey, 1 Gray (Mass.) 461; Wilson v. State, 110 Ala. 1, 20 So. 415, 55 Am.St. Rep. 17; Bullock v. State of New Jersey, 65 N.J.Law, 557, 47 A. 62, 86 Am.St.Rep. 668; Commonwealth v. Cuffee, 108 Mass. 285; People v. Wolcott, 51 Mich. 612, 17 N.W. 78; Ammons v. State, 80 Miss. 592, 32 So. 9, 18 L.R.A.(N.S.) 768, and note page 772, 92 Am.St.Rep. 607.

"And the rule of our decisions is that confessions are presumed to be involuntary, and are prima facie inadmissible, and the burden is on the state to show that they are voluntary. Redd v. State, 69 Ala. 255; Amos v. State, 83 Ala. 1, 3 So. 749, 3 Am.St.Rep. 682; Campbell v. State, 150 Ala. 70, 43 So. 743; Cook v. State, 16 Ala.App. 390, 78 So. 306."

In Watts v. Indiana, 338 U.S. 49, 69 S. Ct. 1347, 1350, 93 L.Ed. 1801, the Supreme Court of the United States, speaking through Justice Frankfurter, said:

"A confession by which life becomes forfeit must be the expression of free choice. A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary. We would have to shut our minds to the plain significance of what here transpired to deny that this was a

calculated endeavor to secure a confession through the pressure of unrelenting interrogation. The very relentlessness of such interrogation implies that it is better for the prisoner to answer than to persist in the refusal of disclosure which is his constitutional right. To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process.

"This is so because it violates the underlying principle in our enforcement of the criminal law. Ours is the accusatorial as opposed to the inquisitorial system. * *"

And in Ward v. State of Texas, 316 U. S. 547, 62 S.Ct. 1139, 1143, 86 L.Ed. 1663, the court, speaking through Justice Byrnes, observed: "This Court has set aside convictions based upon confessions extorted from ignorant persons who have been subject to persistent and protracted questioning, or who have been threatened with mob violence, or who have been unlawfully held incommunicado without advice of friends or counsel, or who have been taken at night to lonely and isolated places for questioning. (Citing authorities.) Any one of these grounds would be sufficient cause for reversal. All of them are to be ·found in this case."

■ After careful and thorough examination of the testimony given on the *voir dire,* we are at the conclusion that the state failed to overcome the presumption that said alleged confessions received in evidence over repeated objections of the defendant's counsel, were involuntary and that the circuit court committed reversible error in admitting the same. We are convinced that said confessions were caused by the constant, coercive and repeated interrogation of the defendant while she was ill, under pressure and under the influence of narcotics. 22 C.J.S., Criminal Law, § 817, subsec. (3), P. 1435.

■ It was not permissible for the witness Dr. Grubbs, though qualified as an expert, to testify that if the gun was held in a certain position when fired the shots would or would not have taken the course they did take in the body of the deceased. Under the evidence adduced this was a question for the jury. Landham v. Lloyd, 223 Ala. 487, 489, 136 So. 815; Roan v. State, 225 Ala. 428, 432, 143 So. 454; Blackburn v. State, 22 Ala.App. 561, 117 So. 614; Crotwell v. Cowan, 236 Ala. 578, 184 So. 195; Louisville & Nashville R. R. Co. v. Manning, ante, p. 43, 50 So.2d 153.

The court, therefore, erred in overruling the defendant's objections to questions eliciting such testimony from said witnesses.

For the errors pointed out the judgment of conviction rendered against the defendant is reversed and the cause is remanded.

In view of this result and the trial to follow this reversal, we deem it not improper to observe that much evidence was offered touching the excellent qualities, conduct and habits of the deceased in the neighborhood where he lived and his pleasant associations with his neighbors and friends, which was wholly immaterial to the issues of the case. Likewise, evidence was received reflecting on the defendant and her habits of frequenting beer drinking places and associating with seamen, which was not relevant to any issue raised. Much of this testimony was received without objection and should not be allowed on another trial.

For the errors noted the judgment of the circuit court is reversed and the cause is remanded. The defendant will remain in custody until lawfully discharged.

Reversed and remanded.

LIVINGSTON, C. J., and FOSTER, SIMPSON and STAKELY, JJ., concur.

LAWSON, J., concurs in the result.