Appellant was indicted on April 3, 1981, for the February 9, 1980, murder of his girlfriend, Josephine Crawford Warren. Ala. Code § 13A-6-2 (a)(1) (1975). After a three day trial, commencing on March 10, 1982, appellant was found guilty of the above offense. On April 16, 1982, appellant was sentenced to life imprisonment. From that conviction he now appeals in forma pauperis.
We have completely reviewed the evidence presented by the state and find that it established a prima facie case of murder. Consequently, appellant's motion to exclude the state's evidence was properly denied. Only a narration of the facts is thus necessary for disposition of this cause.
Dr. Viru Kothandapani, psychologist at Searcy Hospital, examined appellant to determine his mental condition. Appellant was admitted to the hospital on October 21, 1980, and discharged on November 26, 1980. A battery of tests was administered to appellant and several other members of the hospital staff examined, interviewed, and evaluated him. The evaluation revealed that:
 "He's [appellant] healthy in mind of borderline intellectual resources. His adaptabilities are good, he's not mentally retarded. His verbal and communicative abilities are adequate. There is no evidence of mental illness or brain damage or organisity (sic). There is considerable amount of narcissistic self centeredness, preoccupation with satisfying your own needs, that's what it is. Disregard for social values, hypersensitiveness and acting out seem to be the major personality features.
 "There was a tendency, a strong tendency to escape tension and anxiety through alcohol and drug abuse, what we call substance abuse. And the overall personality profile suggested antisocial personality."
Dr. Kothandapani stated that appellant had a low capacity for guilt and remorse and a high level of self protection, the latter manifesting itself by acts or expressions which benefit or protect him. Appellant was characterized as having a very hypersensitive personality. Kothandapani stated that appellant was easily offended when such was not intended.
Dr. Kothandapani noted that generally one's personality does not change appreciably once he has reached adulthood. He stated that such applied to appellant generally and in particular from the period of the victim's death, February 9, to appellant's admission to the hospital, October 21. Dr. Kothandapani testified that appellant complained of a ringing in his ears, but neither his tests nor those of a neurologist confirmed any physical or mental cause of such.
Dr. William Rudder, staff psychiatrist with Searcy Hospital, stated that he also examined appellant during his period of evaluation. Dr. Rudder confirmed the findings of Dr. Kothandapani as to appellant's antisocial personality and its existence on February 9.
Mobile police evidence technician Ronald Meyers testified that, on February 9, 1980, he traveled to the residence of the victim and processed the scene for evidence. He took several photographs of the victim and the scene which he identified. They were admitted into evidence.
On February 9, 1980, 15-year-old Yolanda Crawford lived at 558-B Davidson Street in Mobile with her mother, Josephine Crawford Warren, and her sister, Felicia Westry. Around noon on February 9, Yolanda was preparing to mop the kitchen floor (she had just finished mopping the hallway to the kitchen) when appellant entered the house. Appellant had been the "boyfriend" of Yolanda's mother for some four months, and on occasion he had spent the night there but did not live there or keep any clothes there. Also present were three friends of Yolanda's, who were waiting for her to finish so that they could go downtown. *Page 1338 
When appellant entered the house, Yolanda's mother was coming out of the kitchen, and Yolanda asked her to tell appellant not to walk on the wet hallway. Appellant and Mrs. Warren then went into her bedroom. A friend of the victim's, Dorothy Robinson, was already in the bedroom.
After appellant and Mrs. Warren went into the bedroom, Yolanda finished mopping the kitchen and went into the living room to wait for the floor to dry. While waiting for the floor to dry, Yolanda heard a scream from the bedroom where her mother, appellant, and Dorothy Robinson were. Yolanda did not recognize the voice of the person who screamed, and she did not pay any attention to it because she "thought they were playing." Dorothy Robinson then ran out of the bedroom and Yolanda immediately entered the room and found her mother standing there screaming. Appellant was still in the room, and Yolanda grabbed her mother by the arm and pulled her from the room into the hallway and toward the living room. There was a "whole lot of blood" on Mrs. Warren and the blood got on Yolanda.
Appellant followed Yolanda and grabbed her mother by the shoulder, and Mrs. Warren fell back in appellant's arms. Appellant began striking Mrs. Warren with a closed fist and stated, "If I am going to die, you are going to die." Yolanda told appellant "to stop whatever he was doing." Yolanda did not see a knife. Appellant then lay Mrs. Warren, who was bleeding, on the floor near the bathroom door and ran out of the house. Yolanda then went next door and called an ambulance.
The Reverend Marion Lewis Newman, pastor of Stewart Memorial Church in Mobile, testified that on February 9, 1980, he was alone at his home at 1252 Davis Avenue.
Reverend Newman was upstairs when he heard "a lot of banging" on the glass side door of his house. When Reverend Newman went downstairs, he saw appellant ". . . laying down there knocking on the door, and he was hollering, `Preacher, preacher, preacher, open the door quick, open the door quick, open the door quick.' And he stated the police was trying to find him and kill him." When Reverend Newman inquired as to appellant's identity, appellant told Reverend Newman who his mother was. Appellant's mother was known to Reverend Newman as a neighbor of a member of his congregation. Appellant was not a parishioner of the parish.
Reverend Newman then told appellant to go around to the front door, and, while appellant was doing this, Reverend Newman went upstairs, got a gun, concealed it on his person, and returned to the front door. Reverend Newman had noticed appellant's bloody clothes as well as a knife in his hand. Reverend Newman insisted that appellant relinquish control of the knife to him before he would allow appellant to enter. Appellant complied with the request and gave Reverend Newman the bloody knife. He then entered the living room. Reverend Newman inquired of appellant as to what had happened, to which appellant replied that he had cut his "girlfriend" or "old lady." Reverend Newman told appellant, "Well, don't be too afraid" and "Maybe she is all right. Everybody get cut don't die." Appellant replied, "Well, I believe this one is dead."
After they had talked for a while, under the pretext of calling someone to determine the "young lady's" condition or to get her to a hospital, Reverend Newman summoned the police. At no time did appellant express any concern about the victim's condition. Rather, he was more concerned about his own protection.
Sergeant Wayne Ivie of the Mobile Police Department was on patrol on February 9, 1980. Shortly after leaving the victim's home, he received a dispatch to proceed to Reverend Newman's residence and arrest appellant. Sergeant Ivie found appellant at Reverend Newman's residence and observed his bloody hands and clothing. He advised appellant of his Miranda rights and placed him under arrest for murder. Sergeant Ivie received a blood-covered knife from Reverend Newman. *Page 1339 
Mobile Police Detective Thomas H. Smith was dispatched to the victim's residence, located at 558 Davidson Street in Mobile. Upon arriving, he found the victim had been stabbed several times. After being informed of Reverend Newman's telephone call to the police, Detective Thomas dispatched Sergeant Ivie to Reverend Newman's house to take appellant into custody and transport him to police headquarters.
At the police station, officers seized appellant's shirt, sweater, pants, and shoes. The clothing had fresh bloodstains on it. When initially brought to the police station, appellant was very upset and was "pulling hair from his head, hands full of it."
At 9:00 a.m. on February 12, 1980, appellant was brought to an interrogation room and again advised of his Miranda rights. Appellant had "calmed down a lot more" as compared to the day that he was arrested, although he complained of a "ringing in his head and in his ears" and of his eyes hurting. Smith stated that appellant responded to their questions with understandable answers. Appellant had an eighth grade education and could sign his name, but had difficulty reading. His rights were explained to him orally and he was questioned about his understanding of them. The waiver of rights form was then signed by appellant.
A statement was then taken from appellant. The statement was taken down in shorthand by a stenographer and transcribed. The statement was read to appellant. He initialed each page of the statement and signed it at the end. Appellant's transcribed statement was admitted into evidence.
Reverend Newman was also present at police headquarters on February 12, 1980, when appellant confessed. According to Reverend Newman, he had returned to the police station to check on appellant out of a sense of duty to assure that he was "safe and secure" because of his involvement and his having promised appellant that the police would not harm him. No one requested Reverend Newman to visit appellant.
When Reverend Newman arrived at the police station, he was told appellant would not communicate with anyone. When Reverend Newman saw appellant he told him "get the show on the road. Make this statement. Tell them exactly what happened." Reverend Newman asked appellant if he wanted to make a statement and told him (although appellant appeared normal but reluctant because of being where he was), "Frank, the best thing to do is go ahead and tell them just what happened, and get it over with," and "If you feel, go ahead and make it because I can't do it no good." It was then that police officers explained appellant's rights and took his statement. Reverend Newman was present while the statement was being taken, typed, read back to appellant, and signed by him.
Pathologist Dr. Ford Boudreau performed an autopsy on the body of the victim on February 10, 1980. He noted approximately 30 stab wounds to the body, some of which entered the lungs and heart. In his opinion, blood loss as a result of these stab wounds caused the death of the victim, although the wound to the heart alone would have been fatal. Dr. Boudreau stated that the stab wounds were consistent with being made by the knife Reverend Newman removed from appellant.
Appellant asserts that he was denied his constitutional right to a speedy trial. Appellant offered no testimony to support his contentions made in his motion. Based upon such, the trial court denied appellant's motion to dismiss.
Initially, we note that appellant's pro se motion for "Speedy Trial Rule Without Demand," filed August 13, 1981, is based upon the Uniform Mandatory Disposition of Detainers Act. Ala. Code §§15-9-80, et seq. (1975). The time provisions of the above act are not applicable to the speedy trial issue. Tyree v. State,439 So.2d 1346 (Ala.Cr.App. 1983).
Appellant's sole contention is that the length of time between his arrest and *Page 1340 
trial "is in itself prejudicial" so as to mandate reversal of this cause, even though he admits that "there is no showing in the record that [he] was . . . prejudiced by the length of delay. . . ."
Appellant was arrested on February 9, 1980, and tried on March 10, 1982, resulting in a twenty-five month delay between such. Numerous events occurred between the time of appellant's arrest and trial which caused a substantial portion of the delay. On February 27, 1980, appellant moved and was granted a psychiatric evaluation. On October 21, 1980, he was transferred to Searcy Hospital. The delay between the time of appellant's motion and his transferral was caused by the unavailability of space at the hospital. On November 26, 1980, appellant's evaluation was completed and he was returned to the county jail. Appellant waived a preliminary hearing on December 8, 1980, and was bound over to the Mobile County Grand Jury. Appellant was indicted on April 3, 1981, and on June 9, 1981, was appointed counsel. On August 13, 1981, appellant filed his pro se motion previously discussed. On September 9, 1981, appellant filed a special plea of not guilty by reason of insanity. On September 16, 1981, the trial court granted appellant's "speedy trial" motion and set November 3, 1981, as the date of trial. On November 3, 1981, appellant's case was continued at the state's request with such being reset for February 16, 1982. On February 5, 1982, appellant properly asserted his right to a speedy trial through a "motion to dismiss." On February 16, 1982, the trial court continued appellant's case for one day to allow the state to secure the attendance of a witness. The trial court continued the case on February 17, 1982, because appellant was dressed in prison garb. It set the date of trial specially for March 8, 1982. On March 8, 1982, due to the large court docket, appellant's case was continued, by the court, to March 10, 1982. On March 10, 1982, appellant's trial began.
We have assessed the above facts in light of the four factors enumerated in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182,33 L.Ed.2d 101 (1972), and find no error in the trial court's denial of appellant's motion. We note that appellant did not initially assert his right until eighteen months after his arrest. From that point, seven months passed before appellant was brought to trial. However, appellant's pro se motion filed on August 13, 1981, did not properly present to the trial court the speedy trial question. On February 5, 1982, appellant properly asserted his right to a speedy trial and, a little over one month later, was brought to trial. Of the delays noted above, some can be attributed to the state, some to appellant, and others to the methodology of judicial administration. Of those we find attributable to the state, the delay caused thereby is not so great as to cause a violation of the Sixth Amendment. Lastly, we agree that no prejudice was suffered by appellant due to the delay in bringing him to trial.
The trial court properly denied appellant's pretrial "motion to exclude evidence of confidential communication with clergyman."
We have reviewed the testimony of Reverend Newman, offered at appellant's pretrial hearing on the above motion, and find that it does not support appellant's motion for suppression. In pertinent part, Reverend Newman, a licensed and ordained Methodist minister, testified that: (1) On the afternoon of February 9, 1980, he saw appellant outside his home, which was four blocks away from the murder scene, and observed his bloody clothes, bloody knife, of which he subsequently received possession, and his nervous and excited condition; (2) on that occasion, Reverend Newman had a conversation with appellant in which appellant stated that he had severely cut his girl friend and thought she was dead; (3) appellant's purpose for requesting entrance to Reverend Newman's home was that the "police [were] looking for [him]" and he was afraid that they would kill him; (4) Reverend Newman observed no injury on appellant, who became more relaxed upon entering his home; (5) appellant was *Page 1341 
not one of his parishioners although he knew appellant's mother; (6) appellant did not seek spiritual counseling from Reverend Newman and did not request that he keep their conversation confidential; (7) Reverend Newman did not think he had spoken to appellant confidentially; (8) Reverend Newman promised appellant that the police would not kill him and that he would safely reach the jail; and (9) appellant never asked Reverend Newman not to reveal his whereabouts, which he reported to the police during a telephone conversation, initiated by Reverend Newman and conducted in appellant's presence.
Under Section 12-21-166 (b) Code of Alabama 1975, any person who communicates in a confidential manner with a clergyman, who is acting in his professional capacity, and such communication is, inter alia, a "confession," then "such person or the clergyman shall have the privilege . . . to refuse to disclose and to prevent the other from disclosing anything said by either party during such communication." The requirements which must be met in order for a "priest-penitent" communication to be privileged are:
 (1) The communication must be made to a clergyman as defined,
 (2) The clergyman to whom the communication was made must have received such "in his professional capacity,"
 (3) The communication must have been made in a confidential manner.
Communities discussing statutes similar to § 12-21-166 note that such are strictly construed and make privileged only those communications which are made under the exact conditions enumerated in the statute. The authorities agree that simply because a communication is made to or by a clergyman does not cause it to be privileged. Further, the penitent's communication must be penitential in character so as to fit within those provisions providing for privileged communications of "confessions." Consequently, the term confession as used in the above statute refers "to a penitential acknowledgment to a clergyman of actual or supposed wrongdoing while seeking religious or spiritual advice, aid, or comfort" with such applying "to a voluntary confession as well as one made under a mandate of the church." Annot., 71 A.L.R.3d 794, 808 (1976).
The authorities state that the communicant must have intended his communication to be confidential. Such does not require that the communication be made under an express promise of secrecy, but must have been made in confidence and with the express or implied understanding that it should not be revealed to anyone.Id. at 809.
The facts of the instant case do not establish (1) the confidential nature of appellant's statements; (2) the reception of such by Reverend Newman in his professional capacity, i.e., "confessional relationship," as a clergyman; and (3) the penitential character of appellant's "confession." Appellant has, therefore, failed to establish the privilege created under §12-21-166. The trial court did not err in admitting such evidence. See 8 Wigmore, Evidence § 2394-96 (McNaughton rev. 1961); N. Carraway E. Currie, Jr., Privileges 48 Miss.L.J. 989, 1049-56 (1977); S. Reese, Confidential Communications to theClergy 24 Ohio St.L.J. 55 (1963); Annot., 49 A.L.R.3d 1205 (1973); Annot., 22 A.L.R.2d 1152 (1952).
Appellant challenges the trial court's admission of his extrajudicial statement on the ground that it was coerced due to Reverend Newman's exhortation to him to "tell them just what happened."
The testimony of the police officers clearly established that appellant was given his Miranda warnings prior to making his statement and that he understood his rights and freely and voluntarily waived them. Appellant was not threatened, forced, or intimidated into making his statement.
Reverend Newman testified that on February 12, he visited appellant at the jail. His purpose in seeing appellant was to insure, within his power, that appellant was in "good shape" as he had earlier promised that he would be. At the jail, Reverend *Page 1342 
Newman was informed that appellant had not made a statement or spoken to anyone since his arrest. He told appellant, "Frank, the best thing to do is go ahead and tell them just what happened, and get it over with." Reverend Newman assured appellant that "nothing [would] happen to . . . [him] that shouldn't to this point."
After his conversation with Reverend Newman, appellant made a lengthy statement wherein he confessed to killing Crawford.
It is constitutionally permissible to tell the accused that it is best to tell the truth. Edwardson v. State, 255 Ala. 246,51 So.2d 233 (1951); Curry v. State, 203 Ala. 239, 82 So. 489
(1919); Ellis v. State, 398 So.2d 402 (Ala.Cr.App. 1981); Parkerv. State, 351 So.2d 927 (Ala.Cr.App.), cert. denied,351 So.2d 938 (Ala. 1977).
A review of the circumstances surrounding the promise of Reverend Newman to appellant reveals that such did not operate to produce in the mind of appellant an apprehension of harm or hope of favor rendering his subsequent confession involuntary. Wallacev. State, 290 Ala. 201, 275 So.2d 634 (1973); Sullivan v. State,340 So.2d 878 (Ala.Cr.App.), cert. denied, 340 So.2d 881 (Ala. 1976).
No error was committed by the trial court's admission into evidence of the photographs of the victim taken at the scene.Carpenter v. State, 400 So.2d 417 (Ala.Cr.App.), cert. denied,400 So.2d 427 (Ala. 1981).
The trial court properly admitted the opinion testimony of Dr. Kothandapani, wherein, based upon a hypothetical question, he stated that the fact that appellant had killed a woman in February, 1980, would not have affected his personality significantly between the date of the killing and October, 1980, the month of appellant's psychiatric evaluation.
Dr. Kothandapani was the first witness called by the state. Proof of the corpus delicti had not been established at the time he gave the above opinion. However, the state's evidence that followed unequivocably established the criminal nature of Crawford's death and appellant's perpetration thereof.
As stated in Gamble, McElroy's Alabama Evidence § 130.01 (3rd ed. 1977):
 "It is quite generally stated in the decisions that a hypothetical question asked of an expert cannot be based upon facts which are not in evidence. The better procedure to follow in keeping with this rule, of course, is to bring the expert witness to the stand after all the facts have been introduced upon which you wish to base the hypothetical question. If the expert is asked a question based upon facts not in evidence, the trial court will be upheld on appeal for sustaining an objection to such a question. There are instances, however, when a party can ask the expert witness a hypothetical question based upon some facts which have not yet been placed in evidence. This occurs when the party asking the question promises to introduce the facts at a later point in the trial. The result of this exception is that if the trial court overrules an objection to a hypothetical question based upon facts not in issue, such a ruling will be upheld on appeal if, subsequent to asking the question, the facts are introduced into evidence."
Consequently, any error in the order of the state's proof was subsequently cured.
Appellant did not properly preserve for review the failure of the trial court to give his written requested charges 8, covering the lesser included offense of manslaughter, and 18, 19, and 20, dealing with self-defense. Johnson v. State, 433 So.2d 479 (Ala. 1983); Knight v. State, [Ms. 4 Div. 7, May 3, 1983] (Ala.Cr.App. 1983); Allen v. State, 414 So.2d 989 (Ala.Cr.App. 1981), aff'd,414 So.2d 993 (Ala. 1982).
Nevertheless, all of the charges were without support of the evidence and were thus properly refused. In particular, charge 8 was abstract and charges 18 and 19 were not predicated upon the evidence. *Page 1343 
Lastly, we find no merit to appellant's contention that absent introduction of appellant's inculpatory statements into evidence, the state's evidence was insufficient to prove a prima facie case of murder. To the contrary, it fully established appellant's commission of the instant offense and was further strengthened by his own admissions. Consequently, no error was committed by the trial court in the denial of appellant's motion to exclude.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.