KIER *v.* STATE

[No. 207, October Term, 1956.]

*Decided June 6, 1957.*

The cause was argued before COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ., and KINTNER, J., Associate Judge of the Second Judicial Circuit, specially assigned.

*David N. Bates* and *William H. Murphy* for appellant.

*Alexander Harvey, II, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *Frank H. Newell, III, State's Attorney for Baltimore County,* on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment and sentence to death after a conviction of first degree murder by two judges of the Circuit Court for Baltimore County, sitting without a jury. The only question raised on appeal concerns the introduction into evidence of an alleged confession and other statements made by the accused prior to the trial. At the conclusion of the State's case the defense moved for a directed verdict, which

558

was overruled, whereupon the defense rested without producing testimony.

At about 5:00 P. M. on June 12, 1956, Mr. Bopst returned to his home, 6523 Charles Street Avenue, Baltimore County, and found his wife dead in the living room under circumstances indicating she had been brutally murdered and raped. She had been repeatedly stabbed in the neck, back and abdomen, and was lying in a pool of blood, with the lower part of her body exposed. Her face and head showed various cuts and bruises. According to medical testimony, death occurred between 1:00 and 4:00 P. M., due to the wounds and massive thoracic hemorrhage, and a rape had taken place. A blue coat was found on the walkway outside the Bopst home. It also appeared that an automobile belonging to Mrs. Bopst had been taken. It was later found about a mile from the accused's home, and a fingerprint was taken from it that was subsequently identified by an expert as that of the accused. A neighbor, Mrs. Williams, testified that a young negro, whom she identified as the accused, had called at her home seeking work on June 11, 1956, and that she had written down his name and address on a piece of paper she subsequently gave to the police. She saw him in the neighborhood about 11:30 A. M. on the following day.

The accused was arrested by the police at his home at about 1:00 A. M. on the morning of June 13, 1956. An undershirt, shorts and shoes belonging to the accused were found to contain stains identified as human blood. The shorts also contained seminal stains. Other articles of clothing found in his home, together with fingernail scrapings and hair taken from the accused, were examined without result. The accused was taken to the Parkville Police Station, docketed and fingerprinted. The accused was questioned by two senior police officers from about 4:00 A. M. to 7:00 A. M., at which time he made a statement which was reduced to writing. In this statement the accused denied that he had murdered or raped Mrs. Bopst. He admitted, however, that he had gone to the Bopst home about 2:00 P. M. on June 12 to ask for work. He stated that he looked through the screen door and saw a woman's body on the floor. He went in and picked up

a sword lying near her, which had blood on it. He then went into the bathroom and washed his hands, drying them on a towel. He took her car keys out of her handbag, took the car out of the garage and drove off. Before leaving he wiped the knobs of the front door and screen door on the side porch with his handkerchief to remove fingerprints, but he "got excited" and dropped his coat outside the house. He abandoned the car and went home about 3:00 P. M. He then took a bath, and flushed the car keys down the commode. He "just didn't think" of notifying the police when he found the body. The appellant does not press his objection to this statement, and does not contend that the State failed to meet the burden of showing that it was given voluntarily. It was, of course, not a confession although it contained certain damaging admissions. Cf. *Delnegro v. State,* 198 Md. 80, 87.

After being served breakfast, the accused was taken to the Towson Police Station and questioned further. At about 1:30 P. M. Dr. O'Donnell arrived for the purpose of making a physical examination of the accused. At about 3:00 P. M. the accused made a statement in which he confessed that he had gone to the Bopst home and knocked at the front door. As no one answered he entered the living room from the side porch. Mrs. Bopst appeared from the kitchen and screamed. He struck her with his fists and over the head with a metal object. He stabbed her repeatedly with a sword that was in the room and with knives he found in the kitchen, and then raped her.

The State produced evidence intended to show that this confession was voluntarily obtained, preliminary to its offer in evidence. Dr. O'Donnell testified that the accused was brought into a small room, about 10′ by 12′ in size, where two sergeants were present, who were armed with revolvers and blackjacks. The second officer was present to take down medical findings and what was said. The prisoner was made to strip completely nude. The doctor noted some lacerations on the prisoner's hands. He told the prisoner this was a medical attempt to connect him with the crime, and he proposed to take hair and skin scrapings and anything that looked like blood or sperm from various parts of his

body, including his genitalia. He asked him when he had last had a bath and when he had last had sexual intercourse. He demonstrated the use of a scalpel on his own hand, to show that it would not be painful. He believed that he did scrape the prisoner's arm, but did not touch his genitalia. However, the examination was suspended by questions from the officers. Ordinarily, a physical examination would take only about ten minutes, but this one lasted more than an hour. He told the prisoner that "if the scrapings we take match her blood, why that is proof". One of the officers may have said to the prisoner "it will be better if you tell us the truth". The witness told the prisoner "if you want to tell them about it go ahead because all I want to do is to get out of here." Another version he gave was: "I don't care whether you did it or not, but if you did, how about telling the truth because I have to get out of here." A third version was: "Whether you want to tell them the truth or not I don't care, but say something so I can get out of here." This was about midway through the examination. He did not complete the examination because of the statements the prisoner made. He witnessed the statements after they had been transcribed. The officers did not tell the prisoner he did not have to answer their questions.

Sergeant Gagliano testified he was present at the medical examination. He testified the doctor did examine the prisoner's genitalia, although the doctor had denied this. He did not advise the prisoner of his rights before the verbal statement was made. In reply to a question as to whether he cautioned the prisoner to tell the truth, he replied: "I may have, in the course of the questions, told him it would be better for him to tell the truth." Another version was: "We would appreciate it if he told us the truth about the whole matter." Sergeant McCusker testified he did not interrogate the prisoner until after he made the verbal statement, which he transcribed. He believed that Sergeant Gagliano told the prisoner "I want you to be truthful." He recalled that the doctor did examine the prisoner's genitalia, but did not recall that any skin scrapings were taken. He testified the doctor

told the prisoner "You might just as well go ahead and tell them, we can prove it", or words to that effect.

The State did not offer the confession in evidence at this point, although it was marked for identification. Instead, a court reporter, Mr. Danker, was produced and questioned as to a third statement made by the accused to the State's Attorney on June 27, 1956, at the Baltimore County Jail. The State did not offer this testimony to prove another confession, but solely to establish that the prior confession of June 13 had been voluntary. The whole statement was not offered. Over objection, certain questions and answers were read, to the general effect that the prisoner had not been mistreated or threatened, and that no promises had been made to him, either before or after the confession of June 13; everything he said in the confession was true, and he made the statement without anybody mistreating him or threatening or making any promises of any kind. The State then offered the confession, and the court read it. The court ruled that the confession was not procured by any promise of benefit or reward, and that "any question about that has been cleared up undoubtedly by the questions and answers at the Baltimore County Jail on June 27." In announcing the verdict, the court relied upon the confession, although commenting that there was other evidence to support a finding of guilt.

It is well settled that in Maryland the burden rests upon the State to show that a confession offered in evidence in a criminal prosecution is the voluntary act of the accused. *Jackson v. State,* 209 Md. 390, and cases cited. The State must show to the satisfaction of the court that no force or coercion was exercised by the officers obtaining the confession, to cause the accused to confess, and that no hope or promise was held out to the accused for the purpose of inducing him to confess. *Smith v. State,* 189 Md. 596. In *Edwards v. State,* 194 Md. 387, 398, it was said: "It is also settled law in this State that if the accused is told it would be better for him to tell the truth, such a statement constitutes such an inducement as to make the confession involuntary and inadmissible", citing *Biscoe v. State,* 67 Md. 6, *Watts v. State,* 99 Md. 30, and *Lubinski v. State,* 180 Md. 1. The

State contends that we have never directly held that such a statement alone would invalidate a confession. In *Biscoe v. State, supra,* the words "it would be better * * * to tell the truth" were followed by the words "and have no more trouble about it". In *Watts v. State, supra,* the words, used by a newspaper reporter, were followed by a suggestion that the accused's case would suffer if an erroneous statement were published. In *Lubinski v. State, supra,* the making of the statement attributed ·to him was denied by the police officer, and the confession was held properly admitted. In *Dobbs v. State,* 148 Md. 34, 60, the exhortation to tell the truth was accompanied by a statement that the accused had nothing to fear if he told the truth, and wasn't "in it". Exhortations to tell the truth, or "I want you to tell the truth", have been held not fatal. *Nicholson v. State,* 38 Md. 140. Cf. *Ross v. State,* 67 Md. 286, *Rogers v. State,* 89 Md. 424, 427, and *Deems v. State,* 127 Md. 624, 630. In *Edwards v. State, supra,* the exhortation was coupled with a letter from an inmate of the Penitentiary to the interrogating officer, stating that the writer was sorry he had not listened to the officer, and to tell the next "wise guy * * * what it cost me for not listening to you". This was held to be an improper inducement, although at second hand, which made the confession inadmissible.

It may well be that the implication of a threat or promise should not be drawn from the word "better" alone. In some contexts, at least, the word "better" might refer to moral or spiritual rewards. The inner psychological pressure of conscience to tell the truth does not constitute coercion in the legal sense. Cf. *James v. State,* 193 Md. 31, 42. See also *Wigmore, Evidence* (3rd ed.), §§ 832, 840; *Underhill, Criminal Evidence* (5th ed.), Sec. 388. In the instant case, however, the implication of a threat or inducement does not rest on words alone. Dr. O'Donnell admitted he told the prisoner to "say something" so that he might leave. The implication is perfectly clear. If the nude prisoner would confess, the doctor would forego any further examinations and samplings involving the use of the scalpel in the region of the genitalia or elsewhere, which he claimed would afford

proof of the prisoner's connection with the crime. If the prisoner confessed, the doctor would leave. It appears that the doctor's participation in the interrogation exceeded the usual bounds of a professional, medical examination. We think there was even more of a tangible and present threat or inducement than in the *Edwards* case, *supra*, and some of the other cases cited. In the context, the words of Sergeant Gagliano that it would be better for the accused to tell the truth, take on an added meaning. There was virtually no contradiction of the fact that the words were used, or may have been used. So far from denying that the words were used, the fact or probability of their use was volunteered by the State's witnesses.

The State contends, however, that whatever inferences or implications may be drawn from the circumstances under which the confession of June 13 was obtained, its voluntary character is established by the admissions of the accused on June 27. We may assume, without deciding, that the portions of the third statement were admissible as bearing upon the voluntariness of the prior confession. But see *Williams v. State,* 205 Md. 470, 473. In *Jackson v. State, supra,* p. 396, the State contended that the inference that a confession was involuntary, by reason of prior violence or a reasonable fear of its repetition, was rebutted by statements of the prisoner made subsequent to the confession, in which he admitted that the matters confessed were true and that he was not then threatened and that no promises or inducements were offered. We held, however, that a potential threat was still present. We cited *Edwards v. State, supra,* p. 400, for the proposition that where one confession is involuntary, a presumption exists that any subsequent confession is tainted by the same influence. We held that it was not incumbent upon the accused to take the stand in order to repudiate his subsequent admissions, and that doubts must be resolved in favor of the accused. So, in the instant case, the admissions of the accused in the form of answers to stock questions, do not rebut, if they negative at all, the fact that there was a threat or inducement made at the time of the prior confession.

The State concedes that if the confession were improperly

564

admitted, the error was prejudicial and reversible, even though there was other evidence, including the admissions of the accused in his first statement, to support the verdict. See *Jackson v. State, supra,* p. 397.

> *Judgment reversed and case remanded for a new trial, costs to be paid by the County Council of Baltimore County.*

PRESCOTT, J., concurs in the result.