McKenzie **DAVIS**, Petitioner-Appellant,

v.

John C. **BURKE**, Warden, Respondent-Appellee.

No. 16728.

United States Court of Appeals Seventh Circuit.

March 7, 1969.

Rehearing Denied April 2, 1969.

Kerner, Circuit Judge, dissented.

Thomas W. O'Brien, Milwaukee, Wis., for petitioner-appellant; Brady, Tyrrell, Cotter & Cutler, Milwaukee, Wis., of counsel.

Bronson C. LaFollette, Atty. Gen., William A. Platz, Sverre O. Tinglum, Madison, Wis., for respondent-appellee.

Before CASTLE, Chief Judge, KNOCH, Senior Circuit Judge, and KERNER, Circuit Judge.

KNOCH, Senior Circuit Judge.

The petitioner-appellant, McKenzie Davis, has appealed to this Court from denial of his petition filed in forma pauperis in the United States District Court seeking writ of habeas corpus, naming as respondent John C. Burke, Warden of the Wisconsin State Prison, respondent-appellee in this appeal.

The petitioner was convicted in June 1965 in the Municipal Court for Milwaukee County, Wisconsin, on a charge of first degree murder and was sentenced to life imprisonment. The conviction was affirmed by the Supreme Court of Wisconsin, Davis v. State, 1967, 33 Wis.2d 682, 148 N.W.2d 53.

Although a warrant for his arrest had been issued in January 1947 in Milwaukee County, the petitioner was not apprehended until February 1964 in Pittsburgh, Pennsylvania. The petitioner had been placed in custody there under circumstances having no relation to the Milwaukee charge. After release on bail he was again placed in custody on receipt of a detainer from Milwaukee County. The petitioner waived extradition and Milwaukee Police Department Detective Rudolph Schneider came to escort him back to Milwaukee.

Three statements tending to incriminate the petitioner were obtained from him. After a hearing by the Trial Judge to determine the admissibility of these several statements all three were admitted into evidence at petitioner's trial.

The parties to this appeal are both of the opinion that a violation of the petitioner's constitutional rights rendering his first statement inadmissible would have the same effect on the two subsequent statements for want of a sufficiently substantial change in time and place to counteract the psychological effect of having "let the cat out of the bag." We do not here decide that issue, but we have viewed with great care the circumstances of the initial statement.

As the respondent notes, there is no claim of physical abuse, threat, illness, hunger, lack of sleep or mental deficiency, harassment, lengthy interrogation or subterfuge such as characterizes many

of the cases dealing with admissibility of statements.

■ The first statement was made in public while the petitioner and Detective Schneider were on the airplane en route to Milwaukee. Deputy District Attorney Aladin A. DeBrozzo testified that the petitioner told him of having conferred with his own counsel in Pennsylvania who advised the petitioner to go to Milwaukee and to tell the truth. The Trial Judge specifically found that petitioner had been so advised by his local counsel before he embarked on the trip to Milwaukee. The petitioner would have us ignore this finding in connection with the first statement because the advice, although given prior to the first statement, was disclosed by petitioner in the course of his third statement. We cannot agree with that reasoning. Regardless of the time of its disclosure to the authorities, the fact that petitioner had been so advised was highly pertinent to any statement he made after receiving that advice.

Detective Schneider testified that the petitioner himself opened the subject during the trip by asking: "Can you tell me what is going to happen to me?" The witness testified further that:

I said, "Before we go into that, I want to tell you that I am interested to know what actually did happen, but you don't have to tell me anything, and any statement that you might make to me could be held for or against you in any criminal trial." I informed him that I had a murder warrant, charging him with first degree murder.

I told him that in my opinion the best way would be to tell the truth; and I impressed upon him that if he didn't care to tell me anything he didn't have to. And I informed him that we did have witnesses to the act of murder, and if he didn't care to tell me anything he could wait and discuss things with an attorney that might be appointed for him by the court, if he didn't have money to hire his own attorney.

I then proceeded to talk to the defendant with respect to this case.

I am quite sure that I went into that phase of his rights concerning counsel, because I tried to cover his constitutional rights in every manner that I could possibly think of, and I know he did have counsel in Pittsburgh, and I asked his attorney in Pittsburgh if the defendant had been advised of his constitutional rights.

This cause arose prior to Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, which is not here applicable, Johnson v. New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.

The petitioner lays great stress on Detective Schneider's statement on examination by the Trial Judge:

I don't recall if I informed him of his right to have counsel before he made any statements to me, because he did have counsel.

to show that the petitioner was not advised of his right to have counsel. However, the witness went on to say:

I did testify in my direct testimony to the general effect that in connection with my telling him that he didn't have to say anything, if he didn't want to say anything he could wait and discuss it with counsel, who would be appointed if he didn't have money himself. I told him that before I asked him any questions about the charge.

On re-cross examination, Detective Schneider explained further:

With respect to any statements or comments on my part with respect to the appointment of counsel to represent the defendant. I was making reference to appointment made by this Court or any other Court in the County, once he was brought before a magistrate or before a judge, once formal proceedings had begun. I was referring to any attorney that the court would appoint for him, provided he did not have funds to have one of his own—to hire his own attorney.

The petitioner himself testified that Detective Schneider made no reference at all to petitioner's right to have an attorney before he made any statements.

The Trial Judge who saw and heard the witnesses found that petitioner knew and had been advised of his right to counsel throughout the times of his interrogations and the statements he made.

The petitioner contends that statements obtained from him after his arrest pursuant to a criminal warrant by police officers who knew he had retained counsel, in the absence of that counsel when it was impossible to consult him at the time, are inadmissible in evidence. Petitioner would distinguish the cases on which respondent relies [Jackson v. United States, 1964, 119 U.S.App.D.C. 100, 337 F.2d 136, 139, cert. den. 380 U.S. 935, 85 S.Ct. 944, 13 L.Ed.2d 822; United States v. Childress, 7 Cir., 1965, 347 F.2d 448, cert. den. 384 U.S. 1012, 86 S.Ct. 1936, 16 L.Ed.2d 1030] as dealing only with defendants who had not already retained counsel. We are not sure whether that distinction is valid here as there was evidently some question as to whether the attorney who advised the petitioner in Pennsylvania would come to represent him in Wisconsin. We cannot adopt any general rule that voluntary statements freely given by an accused must be suppressed merely because he has retained counsel, when he voluntarily elects to speak in the absence of that counsel.

We have studied the decisions to which petitioner has invited our attention but find them all distinguished on one or another factual basis. For example, the petitioner made no request for counsel which was deliberately denied as in Es-

cobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and Spano v. People of State of New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265. He was not duped as in Massiah v. United States, 1964, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. He was not denied counsel at trial as in Carnley v. Cockran, 1962, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70. In Lee v. United States, 5 Cir., 1963, 322 F.2d 770, the Court in reversing relied in part on its supervisory power over the administration of federal criminal justice under the McNabb-Mallory doctrine. McNabb v. United States, 1943, 318 U.S. 332, 63 S. Ct. 608, 87 L.Ed. 819; Mallory v. United States, 1957, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479. Lee was in his prison cell fifteen days after arrest on a warrant issued pursuant to indictment. Two special agents of the Bureau of Narcotics went to his cell to interrogate him and later testified to his "admissions." There is no mention in the opinion of any warnings to Lee respecting his right to remain silent or to consult with counsel.

As respondent notes, the same Circuit in the following year, Lyles v. Beto, 5 Cir., 1964, 329 F.2d 332, discussed Lee, observing that no warnings were given to Lee and then declined to reverse denial of writ of habeas corpus in the case of an indicted accused in state custody who was asked if he wished to make a statement. He said he did, whereupon he was removed from jail to an office in a police station where he was told he need not make a statement and that it could be used against him. There is no indication he was told of his right to counsel. Counsel was not appointed for him until later.*

---

* As indicated in Judge Kerner's dissent, infra, the judgment in Lyles v. Beto was vacated by the United States Supreme Court (379 U.S. 648, 85 S.Ct. 613, 13 L.Ed.2d 552, 2d case) and the cause remanded to the Fifth Circuit for reconsideration in the light of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246. In a short per curiam decision, the Fifth Circuit

(363 F.2d 503, 1966) again affirmed the decision of the Trial Judge after such reconsideration in the light of Massiah. The position of the Fifth Circuit with respect to pre-Miranda cases is better clarified in a subsequent opinion, Boulden v. Holman, 1967, 385 F.2d 102, 103 where that Court states its view that non-retroactivity of Escobedo and Miranda does not preclude defendants in completed

■ The petitioner here had been advised by his counsel to tell the truth. He and not Detective Schneider opened the conversation concerning his case while aboard the airplane. From the evidence, the Trial Judge was amply justified in finding not only that there was a complete absence of any coercion but that the petitioner was adequately warned that he need not speak and that he could wait to consult counsel.

As to the circumstances under which the two later statements were made, the evidence even more strongly supports a finding of full preservation of the petitioner's constitutional rights.

We find no error in the decision of the District Court which is hereby affirmed.

The Court is deeply appreciative of the efforts of Mr. Thomas W. O'Brien of the Wisconsin bar who represented the appellant with skill and dedication as Court-appointed counsel.

Affirmed.

KERNER, Circuit Judge (dissenting).

I respectfully dissent. Under the facts and circumstances of this case, I feel that Davis' rights were seriously imposed upon with the deliberate eliciting of confessions from him after he had been arrested on the 1947 warrant, complaint and information (which are tantamount to an indictment here).

On March 13, 1964, during the plane trip with Detective Schneider to Milwaukee, petitioner made the first of three incriminatory statements. The first statement was blatantly elicited from petitioner by Schneider with the standard misleading police approach that "it would be better" or "go easier" on the arrestee if he "confessed." Such a nebulous statement is frequently used by a great number of police forces throughout the United States.[1] Whether this inducement to "confess" is made as a promise or a threat depends almost entirely on the tone of voice used, a vital fact which is usually not before reviewing courts.[2] Whichever it is, it is a form of compulsion by deceit which seriously detracts from the voluntary nature of the confession or statement.

### RIGHT TO COUNSEL

The evidence shows that Davis was not interrogated by Detective Schneider until he had already spent approximately three weeks in custody on the detainer warrant in Pittsburgh. While this does not equate with the incommunicado detentions previously condemned by the Supreme Court,[3] the length of the detention here and its effect on Davis' will and resistance is one factor which should be weighed in determining whether his statements were the result of an uncoerced free will. This is especially so where, as here, the interrogation takes

criminal cases from invoking the safeguards set out in Escobedo and Miranda as a part of an involuntariness claim. We agree. The totality of the circumstances leading to the admissions must be considered in determining the crucial issue of voluntariness.

1. See Interrogations in New Haven: The Impact of Miranda, 76 Yale L.J. 1519, 1544 (1967); D. L. Sterling, Police Interrogation and the Psychology of Confession, 14 J.Pub.L. 25, 41 n. 67, 43–44 (1965); Haynes v. Washington, 373 U.S. 503, 509, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). See also Inbau and Reid, Criminal Interrogations and Confessions 112, 182–186 (1st ed. 1962), in which the authors show the prevalence of this type

of questioning by the frequency of its appearance in court decisions.

2. This problem can largely be alleviated through the use of videotape or similar devices which can preserve the actual interrogation for appellate review. However, these systems are not foolproof as they cannot resolve the credibility conflict between the interrogators and the accused where the accused alleges he was interrogated and coerced outside the presence of the videotaping device and then brought before it in order to make a statement.

3. See Note, Constitutional Law—Right to Counsel—When Does It Accrue?, 14 De Paul L.Rev. 187, 189–192 (1964).

place in the absence of counsel after the right to counsel had accrued.[4] Moreover, while petitioner had retained counsel in Pittsburgh to advise him as regards extradition, there is no showing that during the entire 21-day imprisonment in Pittsburgh anyone advised him of what his rights would be in Milwaukee.

On the plane, Davis asked Schneider "Can you tell me what is going to happen to me?" This question expressed Davis' natural concern as to what he would be faced with in Milwaukee. Rather than answer the question and allay the concern, Schneider took advantage of the concern by refusing to answer until Davis told him what happened in Milwaukee in 1947. In Schneider's direct testimony, quoted by the majority, he stated that in his opinion "the best way would be to tell the truth."

While Schneider stated, on direct examination, that he warned Davis of his right to counsel, on cross-examination and on examination by the trial court he was not sure that he had done so. On cross-examination, he testified:

I am quite sure that I went into that phase of his rights concerning counsel, because I tried to cover his constitutional rights in every manner that I could possibly think of, and *I know he did have counsel in Pittsburgh, and I asked his attorney in Pittsburgh if the defendant had been advised of his constitutional rights.*

*I don't recall if I mentioned "counsel" or not.* [Emphasis added]

Asking Davis' Pittsburgh counsel is hardly the equivalent of asking or advising Davis. Also, Schneider indicated on recross that he may not have warned

Davis of a right to counsel at interrogation but merely referred to the right to counsel at the trial in Milwaukee. On examination by the court, Schneider testified:

I testified, your Honor, that I informed him of his constitutional rights in so far as that he didn't have to give me any information whatsoever, and that any information that he might give could be used in a trial against him. And that it was up to him entirely, if he wanted to tell me what took place.

*I don't recall if I informed him of his right to have counsel before he made any statements to me, because he did have counsel.*

I did testify in my direct testimony to the general effect that in connection with my telling him that he didn't have to say anything, *if he didn't want to say anything he could wait and discuss it with counsel,* who would be appointed if he didn't have money himself. I told him that before I asked him any questions about the charge.
[Emphasis added]

Thus, the testimonial inconsistency on this crucial point continued.

In his testimony concerning the interrogation of March 14, 1964, Schneider did not mention the right to counsel when, on direct examination, he testified as to the warnings given to Davis. On cross-examination, Schneider did not recall advising Davis of the right to counsel nor could he recall that Judge Krueger made *any* reference to any of Davis' constitutional rights.[5] While not testifying as to the hearing, Detective D'Amico did testify as to the second interrogation

---

4. Also, Schneider testified that when he began the interrogation he had no knowledge of how much sleep Davis had had or how he had been treated prior to the interrogation.

5. As to the perfunctory hearing following the second interrogation, Schneider testified:
At the proceedings before Judge Krueger at approximately 12:00 on March the 14th bail was set and he

was remanded to the custody of the Sheriff. *I don't recall whether or not Judge Krueger made any reference to the defendant about his constitutional rights at the time. I don't recall whether or not Judge Krueger made any reference to the appointment of counsel for the defendant at that time.* As I recall, *the proceedings before Judge Krueger took about a minute or two—or three— a short time.* [Emphasis added]

and expressly disagreed with Schneider's testimony.

The third interrogation took place in Assistant District Attorney DeBrozzo's office. DeBrozzo testified that *prior* to the stenographic transcription he discussed extensively with Davis the question of his right to counsel *at trial* and he did not give a right to counsel *at questioning* warning. He testified, on direct examination:

> *Yes, it is correct that the written transcript does not indicate that I advised this defendant of his right to have counsel before he made any statements to me.* I remember the whole thing quite clearly. What happened, if I may elaborate—what happened was that an attorney from Pittsburgh— I believe his name—I discussed the matter of counsel with the defendant. I didn't advise him but I discussed the matter with him, that's what I wanted to elaborate. He did have counsel.

> \* \* \* \* \* \*

> I did state to the defendant—in fact, before and even during the taking of the statement, that he, under the law, both Federal and State, he was not required to make any statement of any kind that might in any way incriminate him. That if he did make a statement, the statement could be used against him in any court of law, at any trial or proceeding in which he was the defendant.

> I advised him that if he wanted to make a statement, that we wanted a true statement, and I asked him if he would make such a statement, and he declared that he would. As far as I know within the written framework of his stenographic statement, *what I have just stated here is the extent of my advice given to the defendant, with respect to his constitutional rights.* There was other matter that was discussed orally before the stenographer was called.

[Emphasis added]

The stenographic transcript itself confirms DeBrozzo's recollection that he did not give the warning. After questioning Davis on his background and education, the transcript shows the following between DeBrozzo and Davis:

> Q. I would like to advise you at this time, Mr. Davis, under the law you are not required to make a statement on anything that happened while you were here in Milwaukee, that's your constitutional right not to make any statement that would incriminate you, you understand what I mean by that?
>
> A. Yes.
>
> Q. Knowing that anything you say can be used for or against you in a court, do you want to make a statement explaining what happened here in Milwaukee?
>
> A. *If it's necessary I will, if not I won't.*[6]

Schneider's testimony as to the third interrogation was directly controverting:

> The defendant was asked questions by Mr. DeBrozzo and he gave answers at that time. Prior to the asking of these questions Mr. DeBrozzo or somebody else advised the defendant of his constitutional rights. Mr. DeBrozzo advised the defendant of his constitutional rights. He told him that any statement he would make could be used in a court for or against him. He told him that he didn't have to make any statement if he didn't want to, and *he told him that he had a right to counsel.*

[Emphasis added]

Immediately thereafter, Schneider repeated the litany he had previously used as to the absence of coercion.

Thus, without even considering Davis' testimony, Schneider's testimony was shown to be in conflict with that of

---

6. Emphasis added. It is worth noting that even after two prior interrogations, Davis continued to express a reluctance to talk. In the absence of transcripts or contemporaneous notes, one can only speculate about the true nature of the two prior interrogations. See note 12, *infra.*

D'Amico and DeBrozzo. Schneider's testimony in the transcript concerning the absence of coercion, physical maltreatment and promises or threats was given three times as a well-memorized litany whose substance barely varied upon repeated recitation. That this was not spontaneous testimony is further shown by the fact that D'Amico's version of the same formula was also recited in strikingly identical language. Moreover, both ask us to believe that they were giving a careful *Escobedo*-type warning, *four months before that case was decided,*[7] to an accused whose right to counsel after indictment *was not decided until three months later.*[8] I, for one, am unwilling to accept such patterned, self-serving and conflicting testimony as determinative of Davis' rights.

Davis' testimony as to the crucial first interrogation on the plane was substantially similar to that of Schneider, except on the question of warning of the right to counsel:

I had conversations with Detective Schneider on the plane trip from Pittsburgh to Milwaukee. I had conversations in respect to the charge against me by the State of Wisconsin, Milwaukee County. Detective Schneider, he said to me—he said actually, what happened—if you care to tell me, he said, because, he say, you know your constitutional right. He said "Anything you tell me," he said, "can be held against you as well as for you." So I didn't know the meaning of it—that's what he said.

*He didn't make any reference at all to my right to have an attorney before I made any statement to him.*

This was on the plane trip. He said that *"The better you cooperate, well, the better it is for you,"* so that's all he said. This statement was made in between the time I was making statements to him.

[Emphasis added]

Davis' testimony as to the second interrogation confirms Schneider and D'Amico insofar as the right to counsel *at trial.* However, it also indicates that Davis was required to waive his right to a preliminary hearing in order to secure appointed counsel.[9] Davis' testimony as

---

7. Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (June 22, 1964).

8. Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (May 18, 1964).

9. Davis testified:

I was asked certain questions by the officers. I gave certain answers. Officers D'Amico and Schneider they said that—they asked me—they say *"You know your constitutional rights." Well, I didn't know. I thought I did, but I didn't. They never mentioned no word about no attorney. He told me, he said "The State will appoint you an attorney after you go up and waive a preliminary, and the State will appoint you an attorney." There was specific reference made by the officers as to the waiver of preliminary hearing. Mr. Schneider said "All you got to do is just waive preliminary and they will appoint you an attorney." "So you don't have money to hire an attorney," he said "and they will appoint you an attorney."*

*Neither of the officers ever told me on the morning of the 14th of March that I had the right to counsel or the right to the advice of counsel before I gave them any statements,* all they said to me was "You know your constitutional rights," they said "Whatever you say can be held against you as well as for you." That's all they said. *They never mentioned about no attorney because they said that "They will appoint you an attorney for your case. All you have to do is waive preliminary."*
I in fact gave the officers a written statement in my own handwriting on the morning of the 14th. The statement was in my own words. After I gave the statement I was taken into a court room. Before that, we was taken —I was taken into DeBrozzo—DeBrozzo, he turned it down, he said "I don't want no part of it, it's too far back." And Mr. Schneider said "I want to get the man booked and get him out from over here from the City Jail to the County." He said "I don't want him to stay another night over in the City Jail."

to the perfunctory hearing before Judge Krueger is confirmed by Schneider's recollection that the judge did not advise Davis of his rights. His testimony as to the absence of a right to counsel warning at the third interrogation is confirmed by DeBrozzo's testimony and the stenographic transcript and *all are controverted by Schneider*. I cannot agree with the majority that "the Trial Judge was amply justified" in finding any adequate warning of the right to counsel.

## CONFESSION COERCED

Nor am I able to agree with the conclusion of the majority that there was no coercion here. As I indicated at the beginning of this dissent, I believe that the language used by Schneider on the plane was coercive and deceptive. It was an implicit promise or threat which he had no power or authority to make. If it was a promise, presumably of lenient treatment, it was one which Schneider was powerless to implement.[10] Of those involved in this case, only DeBrozzo may have had some authority to make a promise to Davis. If it was said as a threat, it was an ominous warning of what could only be unconstitutional police miscon-

duct condemned by many Supreme Court cases.

Deceptive questioning has been characterized as of questionable legality by various writers.[11] In some specific cases, it has been found unconstitutional by the Supreme Court.[12] In Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), a combination of the "small book system" and the "if you cooperate" approach was held to constitute unconstitutional coercion and inducement sufficient to vitiate a confession where the benefit of "cooperation" was that the accused would be booked and permitted to call his wife after sixteen hours of incommunicado detention.

Also compelling, is the rejection of "it will be better for you" by the leading author of widely followed police texts on interrogation. Professor Fred E. Inbau has been criticized by various writers as an advocate of harsh and improper police practices, especially in the areas of interrogation and detention.[13] The most authoritative criticism of his methods of interrogation was undertaken by the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 448–455, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966). In that . . . able

---

So Mr. DeBrozzo said "Take him on down to the court, then, and *he's going to waive preliminary, anyway*, and let them book him and in that way you can get him out from over here in the City Jail," and that's what he did. [Emphasis added]

10. This was clearly not a situation subject to "station adjustment," i. e., the adjusting of a minor criminal matter in the police station or outside of it usually characterized by the non-invocation of the formal booking process. *Cf.* LaFave, Arrest—The Decision to Take a Suspect into Custody, esp. ch. 3–5 and 9 (1965). This is to be distinguished from the illegal "small book system" used as an aid to interrogation and, frequently, incommunicado detention. See *supra* note 3 at 193–194.

11. See B. Weisberg, *Police Interrogation of Arrested Persons: A Skeptical View*, in Police Power and Individual Freedom 153, 165–166 (Sowle, ed. 1962), and citations in notes 1 and 3, *supra*.

12. See, *e. g.,* Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954), Spano v. New York, 360 U.S. 315, 323, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). An excellent analysis of the state of mind required for an admissible voluntary confession, the product of a "free will and intellect" given out of a "freedom of choice," is contained in Pea v. United States, 397 F.2d 627, 632–636, esp. 634 (D.C.Cir. 1967). Also note the subsequent *en banc* decision in *Pea* regarding the degree of proof required for admission of the confession. *Id.* at 637.

13. See, *e. g.,* E. Cray, Criminal Interrogations and Confessions: The Ethical Imperative, 1968 Wis.L.Rev. 174; Sterling, *supra* note 1 at 43–46; E. Landau, Freedom of the Road: Public Safety v. Private Right, 14 DePaul L.Rev. at 413–414 (1965); Note, *supra* note 3 at 193–194; LaFave, *supra* note 10 at 384–385 (cites others); and Weisberg, *supra* note 11, *passim*.

opinion, many examples of Inbau's stratagems are quoted and criticized for their coercive effect and the Court expressed its fear over "this interrogation atmosphere and the evils it can bring." *Id.* at 456, 86 S.Ct. at 1618. It further pointed out that Inbau's caveats against methods which may make an innocent person confess [14] are of little avail to an innocent person who was so compelled.[15] Yet, even Inbau states that "It would go better for you if * * *" is *not* to be used.

In Inbau and Reid, Criminal Interrogations and Confessions (1st ed. 1962), it is stated:

> Advising or imploring a subject to tell the truth is never considered objectionable. *Some difficulties occasionally arise, however, when the interrogator uses such language as, "It would be better for you to confess"; or "You had better tell the truth."*
>
> *A number of courts have held that such statements as, "You had better confess," or "It would be better for you to confess," constitute threats or promises which will nullify a confession. Some courts have gone so far as to hold that the same rule applies even when the subject is told, "It would be better to tell [or you had better tell] the truth."* There are many cases, however, in which the courts have taken a more liberal view, particularly as regards the latter type of expressions. Nevertheless, *it is well for the interrogator to play safe and avoid the use of expressions involving the words "You had better * * *" or "it is better * * *."* [16]

Similarly, Inbau and Reid warn that the same language may constitute an impermissible promise:

> There are certain types of promises that an interrogator is permitted to make, and there are others which are prohibited. The line of demarcation is usually determined by the following question: "Is the promise one that is likely to cause the subject to make a false confession?"
>
> As a general rule, in order for a promise to invalidate a confession it must have reference to the subject's escape from punishment or the mitigation of his punishment. It is not sufficient if the promise merely offers the subject an opportunity for the gratification of his personal desires and comfort, or for the granting of a benefit to some third person. It must also be a promise made by "One in authority"; if made by a private citizen, the promise is generally held not to void the confession.
>
> \* \* \* \* \* \*
>
> *Expressions such as, "It would be better for you to confess," or "it would be better for you to tell the truth," have been interpreted by a few courts as constituting promises sufficient to invalidate a confession. It is suggested, therefore, that the interrogator avoid the risk incurred by the use of expressions of this nature.*[17]

---

14. See, *e. g.,* Inbau and Reid, *supra* note 1 at 157 and 207–209 and Inbau, *Police Interrogation—A Practical Necessity,* in Police Power and Individual Freedom at 151 (Sowle, ed. 1962).

15. 384 U.S. at 436, n. 24, 86 S.Ct. 1602. See also Sterling, *supra* note 1 at 25–27 where he details how, in 1949, with *moderate* British interrogation practices, the innocent Tim Evans made four confessions to the murder of his wife and child of which Reginald Christie's subsequent confession cleared him. That this was of no avail to Evans is detailed by Sterling's description of his hanging, and by a modern ballad "Tim Evans," in Judy Collins, A Maid of Constant Sorrow, Elektra Records EKL–209 which states, in better tragic poetry than Sterling:

> They sent Tim Evans to the drop,
> For a crime he did not do;
> Twas Christie was the murderer,
> The judge, and jury too.
> Go down, you murderer, go down!

16. *Id.* at 181–182. Emphasis added, footnotes omitted.

17. *Id.* at 183–184, 186–187. Emphasis added, footnotes omitted.

While the cases cited to support these statements are not legion, they are sufficient to show that some courts, *prior to Miranda,* recognized the inherent dangers and condemned such phrases.[18] A similar problem as to what may or may not be coercive language also exists under the National Labor Relations Act.[19]

Given the above, it is therefore no surprise that in the *identical situation* presented by the instant case, Inbau and Reid advise the interrogator to say:

> * * * *"Joe, I can't tell you what will happen. I'm in no position to say; I don't have the authority, and it wouldn't be fair to you if I made any commitment to you.* Joe, my advice to you is to tell the truth—and to tell it now. Then if you think you have a break coming, talk it over with the district attorney or the judge."* Immediately thereafter, the interrogator should ask a detail question such as where, how, when, or why the subject did the act in question.

By responding to the subject's "what will happen to me" question in the above suggested way, the interrogator displays an attitude of fair play, which is quite impressive. *Moreover, if later on the offender retracts his confession on the ground that it was obtained as a result of promises and inducements, the interrogator can in all sincerity relate the foregoing comments to good advantage.*[20]

I simply urge that the authors have foreseen the very problem before us in this case.

## EFFECT OF CHANGES IN CONFESSION LAW

In urging the particular result as to this confession, I am not unmindful of the fears expressed by some citizens and a few commentators that the courts are damaging law enforcement through "technical" decisions in cases such as *Escobedo* and *Miranda.* Fortunately, the "damage" is much more imagined than real. Firstly, the rights here sought to be protected are fundamental ones under the Fifth, Sixth and Fourteenth Amendments. They are basic protections for all the people against unjust prosecutions and overzealous police work. Secondly, the public's conception of such decisions is impaired by lack of information and the absence of a proper back-

18. See, *e. g.,* Kier v. State, 213 Md. 556, 132 A.2d 494 (1957) ; Edwards v. State, 194 Md. 387, 71 A.2d 487 (1950) ; Edwardson v. State, 255 Ala. 246, 51 So. 2d 233 (1950) ; State v. Robinson, 215 La. 974, 41 So.2d 848 (1949) ; State v. Linn, 179 Or. 499, 173 P.2d 305 (1946) ; People v. Leavitt, 100 Cal.App. 93, 279 P. 1056 (1929) ; State v. Nagle, 25 R.I. 105, 54 A. 1063 (1903) ; West v. United States, 20 App.D.C. 347 (1902) ; Biscoe v. State, 67 Md. 6, 8 A. 571 (1887) ; and Ann v. State, 30 Tenn. 159 (1850). See also statutory attempts to deal with the problem in Burn's Ind.Stat. vol. 4, pt. 1, § 9–1607; La.Code Crim. Proc. § 451; Ore.Stat. § 136.540; and Wash.Rev.Code Ann. § 10.58.030. The latter has been applied in State v. Winters, 39 Wash.2d 545, 236 P.2d 1038 (1951) ; and State v. Meyer, 37 Wash.2d 759, 226 P.2d 204 (1951). *Cf.* Wigmore, Evidence, §§ 832, 838 (1940).

19. Note the contrast between coercive language under § 8(a) (1), 29 U.S.C. § 158 (a) (1) and protected employer speech under § 8(c), 29 U.S.C. § 158(c), as discussed in Restrictions on the Employer's Right of Free Speech During Organizing Campaigns and Collective Bargaining, 63 Nw.U.L.Rev. 40, esp. 47–52 (1968), and E. Landau, Changes in Employer Structure and Operations and Their Effect on Collective Bargaining Rights, 15 DePaul L.Rev. 117, esp. 123–125 (1965).

20. *Supra* note 1 at 112–113, emphasis added. The quotation of Inbau's advice for the purpose of this opinion should not be taken as any endorsement of his exact language; especially as to "and to tell it now." It is interesting that this section of the text immediately follows the portion condemned in *Miranda* where the authors advise the interrogator to discourage a suspect's request for an attorney. 384 U.S. at 454, 86 S.Ct. 1602.

ground against which to weigh them.[21] In some instances, at least, the public's misconception is due to misinformation as to the actual holding and reasoning in decisions as reported by the media.[22]

Thirdly, and most important, are the actual effects of such decisions on police practices and on prosecutions. Many recent empirical studies have shown the impact of these decisions to be very small, bordering on the insignificant. In one survey of police departments across the nation, it was shown that *Miranda* and *Escobedo* had little or no effect on the manner of interrogations outside the police station, that not all gave the full warning (usually omitting the portion regarding the right to have court-appointed counsel), that half of the police continue the interrogation and not wait for counsel *after* the request for counsel had been made, and that one-quarter continue even after counsel asked that the interrogation temporarily or permanently stop.[23] Moreover, 7% of city police and 19% of small city police said they did not intend to comply with *Miranda's* requirements unless it was to their advantage to do so, in particular cases, or they would continue their pre-*Miranda* practices.[24] One respondent stated:

> I will follow the same procedure I have in the past. I will advise the suspect of his rights when it can be used to my advantage. For example,

this can be done in such a way as to gain the suspect's confidence, lead him to believe you are on his side.[25]

Similarly, the Yale study of post-*Miranda* practices in New Haven showed that while at a majority (⅔) of interrogations some warning of rights was given, the full warning was given to less than one-third of the suspects.[26] This study also noted that few of the detectives complied with the spirit of the warnings (when given), that coercive interrogations still occurred, and that in three-fourths of the interrogations one or more of the questionable Inbau stratagems was used.[27] It was also concluded that:

> We conclude that warnings had little impact on suspects' behavior. No support was found for the claim that warnings reduce the amount of "talking." Other factors such as the seriousness of crime involved, the amount of evidence available, and whether or not the suspect had a record seemed much more determinative of interrogation outcome. We have also concluded that warnings failed to protect some of the suspects they apparently were particularly designed to help.[28]

In Pittsburgh, a similar study also took into account the effect on prosecutions. While the study found that confessions in some categories of major crime declined by about one-third, in at least one category (sex crimes) there

---

21. Some of the latter problem can be alleviated. One program which does so is the federally funded "Law in American Society" project which has prepared teaching materials now used in Civics and Social Studies courses in high schools and the upper grades in grammar schools.

22. Note, for example, the treatment of this Court's *en banc* decision in United States v. White, 405 F.2d 838 (1969), in Chicago Sun-Times 1, col. 1 (Jan. 7, 1969) (Home Edition).

23. C. D. Robinson, Police and Prosecutor Practices and Attitudes Relating to Interrogation as Revealed by Pre- and

Post-Miranda Questionnaires: A Construct of Police Capacity to Comply, 1968 Duke L.J. 425, 507–508.

24. *Id.* at 514.

25. *Id.* at 469. Note how the last sentence of this remark parallels Inbau and Reid's 1962 statement on how to handle a request for counsel. Inbau & Reid, *supra* note 1 at 111–112.

26. Interrogations in New Haven: The Impact of Miranda, 76 Yale L.J. 1519, 1550–1551 (1967).

27. *Id.* at 1551–1552 and 1558–1562.

28. *Id.* at 1563. See also *id.* at 1613.

was a slight rise.[29]   More important, however, was the effect on prosecutions. Here it was seen that the effects of *Miranda* were *completely absent:*

1. The overall conviction rate for major crimes was virtually unchanged as shown by pre and post statistics:

   | | |
   |---|---|
   | 7/1/64–6/30/65 | 71.3%. |
   | 7/1/65–6/30/66 | 73.5% |
   | 7/1/66–6/30/67 | 72.5%; |

2. The overall conviction rate for all crimes was virtually unchanged going from 66.8% pre-*Miranda* to 66.4% post-*Miranda;* and

3. The number of persons entering guilty pleas *increased* both for major crimes (from 22.4% to 27.9%) and for all crimes (from 22.1% to 25%).[30]

In New York, in 1965, it was determined that confessions were sought to be used as evidence in only 86 out of 1,000 criminal cases.[31]   In Detroit, a police study found that confessions were given in 64.7% of pre-*Escobedo* prosecutions and in 65.6% of those after *Escobedo,* a small percentage *increase.*[32]   Lastly, in Los Angeles, a similar study by the District Attorney of the effects of *Miranda* showed an *increase* in the percentage of confessions from 43% to 47%.[33]

## APPLICATION OF MASSIAH

Assuming, *arguendo,* that the previously discussed reasons for reversal here are not correct, there still remains the question of the effect here of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).  I cannot agree with the limited reading which the majority here gives to *Massiah.*  The holding in that case is not confined to instances where deceit or trickery was used in the interrogation process.

In *Massiah,* the defendant was indicted, retained a lawyer, pleaded not guilty and was released on bail.  Subsequently, a co-defendant engaged him in a conversation which was overheard by federal agents through a radio transmitter.  During the conversation, Massiah made incriminating statements which were transmitted to and heard by the agent who testified as to those statements at Massiah's trial.  On certiorari from the affirmance of Massiah's conviction, the admission of the statements was urged as reversible error on the grounds that the statements were obtained in violation of his Fourth, Fifth and Sixth Amendment rights.

After stating that it would not reach the Fourth Amendment ground, and then analyzing the concurring opinions in Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), the Supreme Court stated:

> Ever since this Court's decision in the *Spano* case, the New York courts have unequivocally followed this constitutional rule.  *"Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime."*  People v. Waterman, 9 N.Y. 2d 561, 565, 216 N.Y.S.2d 70, 75, 175 N.E.2d 445, 448.

29. Seeburger and Wettick, MIRANDA in Pittsburgh—A Statistical Study, 29 U. Pitt.L.Rev. 1, 11–12 (1968).

30. *Id.* at 18, 19 and 22.

31. Sobel, The Exclusionary Rules in the Law of Confessions: A Legal Perspective—A Practical Perspective, 154 N.Y. L.J. 1, col. 4, Nov. 22, 1965.

32. See the Piersante study discussed *supra* note 26 at 1640–1642.

33. Younger, Interrogation of Criminal Defendants—Some Views on Miranda v. Arizona, 35 Fordham L.Rev. 255 (1966), as analyzed in *supra* note 26 at 1641. For an interesting study of interrogation practices in Southern California, see E. L. Barrett, Police Practices and the Law—From Arrest to Release or Charge, 50 Calif.L.Rev. 11, esp. 42–44 (1962). Other related early studies are cited in LaFave, *supra* note 10 at x, n. 3.

*This view no more than reflects a constitutional principle established as long ago as* Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, where the Court noted that " \* \* \* during perhaps the most critical period of the proceedings \* \* \* that is to say, *from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants \* \* \* [are] as much entitled to such aid [of counsel] during that period as at the trial itself.*" *Id.*, at 57, 53 S.Ct. at 59, 77 L.Ed. 158. And since the *Spano* decision the same basic constitutional principle has been broadly reaffirmed by this Court. Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193. See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799.

Here we deal not with a state court conviction, but with a federal case, where the specific guarantee of the Sixth Amendment directly applies. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. *We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel.* It is true that in the *Spano* case the defendant was interrogated in a police station, while here the damaging testimony was elicited from the defendant without his knowledge while he was free on bail. But, as Judge Hays pointed out in his dissent in the Court of Appeals, "if such a rule is to have any efficacy it must apply to indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon \* \* \* because he did not even know that he was under interrogation by a government agent." 307 F.2d at 72–73.[34]

These emphasized portions express my understanding of the holding in *Massiah*. This is not to say that all investigation must cease. The rule simply states that at this stage of the proceedings, the government is no longer free to elicit statements from the indicted party in the absence of counsel for use at trial. As the Court stated,

> \* \* \* We do not question that in this case, as in many cases, it was entirely proper to continue an investigation of the suspected criminal activities of the defendant and his alleged confederates, even though the defendant had already been indicted. All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial.[35]

That this rule does not depend on the artifice used in *Massiah,* is not only clear from the opinion but is shown by later applications of the rule. In Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the suspect was, as here, questioned directly by the police without the type of deception used in *Massiah*. The Court stated:

> In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, this Court observed that "*a Constitution which guarantees a defendant the aid of counsel at \* \* \* trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less \* \* \* might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'*" *Id.*, 377 U.S.

---

34. 377 U.S. at 204–206, 84 S.Ct. at 1202. Emphasis added, notes omitted.

35. *Id.* at 207, 84 S.Ct. at 1203, emphasis in original.

at 204, 84 S.Ct., quoting Douglas, J., concurring in Spano v. New York, 360 U.S. 315, 326, 79 S.Ct. 1202, 3 L.Ed.2d 1265.

*The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference.* When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of "an unsolved crime." Spano v. New York, 360 U.S. 315, 327, 79 S.Ct. 1202 (Stewart, J., concurring). Petitioner had become the accused, and the purpose of the interrogation was to "get him" to confess his guilt despite his constitutional right not to do so. * * *[36]

*Accord,* United States v. Wade, 388 U.S. 218, 224–225, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

In United States v. Hensley, 374 F.2d 341 (6th Cir. 1967), the court, in affirming the conviction and finding no error, held, 374 F.2d at 348:

> None of these confessions was derived from interrogation following indictment. *Cf.* Massiah v. United States, *supra.*

See also McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) (per curiam), reversing 1 Ohio St.2d 60, 203 N.E.2d 349 (1964); Beatty v. United States, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (per curiam), reversing 377 F.2d 181, 189 (5th Cir. 1967); and United States v. Adler, 380 F.2d 917, 920–921 (2d Cir. 1967). *Cf.* Miller v. California, 392 U.S. 616, 623–625, 88 S.Ct. 2258, 20 L.Ed.2d 1332 (1968) (Marshall, J., dissenting).[37]

36. 378 U.S. at 484–485, 84 S.Ct. at 1761. Emphasis added.

37. One commentator, who was a protege of Inbau, also agrees that the rule in *Massiah,* does not depend on the use of deception. D. Robinson, Massiah, Escobedo, and Rationales for the Exclusion of Confessions, 56 J.Crim.L.C.&P.S. 412 (1965) analyzed *Massiah* as holding:

It seems clear that the Court's decision, in which six members joined, cannot be

Finally, the majority here relies on Lyles v. Beto, 329 F.2d 332 (5th Cir. 1964) and its restricted interpretation of Lee v. United States, 322 F.2d 770 (5th Cir. 1963). It should be noted that Lyles v. Beto, 379 U.S. 648, 85 S.Ct. 613, 13 L.Ed.2d 552 (1965) (per curiam), reversed the determination of the Fifth Circuit. The sole case cited for reversal was *Massiah.*

On the state of this record and on my understanding of the rule in *Massiah,* I would reverse.

supported on a deterrent theory. To be sure, deception at the instigation of the government was involved, but this is a necessary concomitant of all undercover operations. *More fundamentally, the Court did not predicate its decision on such deception in immunizing the defendant from its effects.* The Court appears to accept the propriety of further investigation itself.

*Id.* at 419, emphasis added.